# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: September 26, 2018

**No. A-1-CA-35261**

**CITY OF ALBUQUERQUE**
**A municipal corporation,**

    Petitioner-Appellee,

v.

**SMP PROPERTIES, LLC. and**
**R. MICHAEL PACK,**

    Respondents-Appellants,

and

**MODERN WOODMEN OF AMERICA;**
**SAIA MOTOR FREIGHT LINE, LLC;**
**UNITED PARCEL SERVICE, INC.;**
**COUNTY OF BERNALILLO;**
**TAXATION AND REVENUE**
**DEPARTMENT FOR THE STATE OF**
**NEW MEXICO AND ANY AND ALL**
**UNKNOWN CLAIMANTS FOR**
**THE PROPERTY INVOLVED,**

    Respondents.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Nancy J. Franchini, District Judge**

Esteban A. Aguilar, City Attorney
Kevin A. Morrow, Assistant City Attorney
William W. Zarr, Assistant City Attorney

2

Albuquerque, NM

for Appellee

Dubois, Cooksey & Bischoff, P.A.
William J. Cooksey
George A. Dubois
Albuquerque, NM

for Appellants

**OPINION**

**VIGIL, Judge.**

{1}    This is a condemnation case brought by the City of Albuquerque (City) to acquire a thirty-foot wide strip of land to build a road on property operated as a freight truck terminal by tenants. The issues are (1) whether lease payments from a tenant may be considered in computing just compensation when the City's precondemnation actions caused the tenant not to renew its lease with the property owner and the lease term had ended when the condemnation action was filed; and (2) whether those same actions by the City may give rise to a claim for inverse condemnation and damages. The district court granted the City summary judgment on both questions, and the property owner appeals. After first determining that the property owner has a right to appeal, we conclude that the rulings of the district court were in error and reverse.

**BACKGROUND**

**I.      The Hawkins Property and The City's Precondemnation Actions**

3

{2}    We refer to the property in question as the Hawkins Property, which is owned by SMP Properties, LLC (SMP) and Michael Pack, the owner and manager of SMP (collectively, Defendants). The undisputed facts are as follows. The Hawkins Property houses a sixty-five-door freight truck terminal on approximately 9.859 acres of land at 3700 Hawkins Street, in Albuquerque, New Mexico. At the pertinent time, SMP leased twenty-nine doors to SAIA Motor Freight Line, LLC (SAIA), a motor trucking company, and thirty-six doors to UPS. SAIA's lease was for a three-year term beginning on March 1, 2003. The lease contained two three-year options to renew, and SAIA exercised both options. Each time the lease was renewed, Thomas Davis, the property manager for SAIA, and Pack first discussed and agreed on any changes they wanted, such as the lease amount. Davis would then draft a letter incorporating the agreed upon changes, and after the letter was reviewed by SAIA's attorneys, it was sent to Pack, who signed the letter on behalf of SMP and faxed it back to Davis. Each letter was considered an addendum to the original lease. The lease with the options ended on February 28, 2012.

{3}    Davis testified that because bulk fuel is cheaper than purchased fuel, SAIA embarked on a project to install fuel tanks in a number of its terminals, including its terminal on Hawkins Property. Sometime in mid-2009, he asked Pack if SAIA could install a fuel tank on the facility, and Pack agreed. After securing Pack's permission, Davis started the installation, which was completed in August 2010—

4

during the last lease renewal period and at a cost of $180,000. SAIA installed two above-ground, 6,000-gallon tanks connected by a transfer pump.

{4} SAIA was willing to spend the $180,000 in the last lease term because SAIA had every intention of staying on the property. At the time SAIA sought permission from Pack to install the tanks, Pack was aware that SAIA was going to stay for another three years with two additional three-year options. Further, SAIA's policy was not to install a tank at a location where it did not have the ability or intention of staying less than eight years, and SAIA never violated that policy.

{5} In early December 2011, Davis and Pack agreed to renew the lease for another three-year term. Mr. Pack asked Mr. Davis about sending him a letter as he had in the past to memorialize the new lease, and Mr. Davis replied that there was no problem and that he was having SAIA's attorney review the letter before signing it and sending it as he had in the past. However, the lease extension was never sent. Instead, SAIA, suddenly and without notice, sent SMP a letter on March 30, 2012, terminating its lease and immediately started looking for a new location to operate.

{6} The reason for SAIA's sudden departure was that one day a man from City planning or zoning showed up at the office of SAIA's terminal manager, Kevin Russell, and said the City was going to cut a road through part of the Hawkins Property. Jeffrey Willis, the City's right of way coordinator, said that although he

5

knew who the owner of the property was, he decided not to contact the owner. Instead, he went to the Hawkins Property and informed the tenant about the City's condemnation plan. Russell said the man from the City showed him where the road was going to be cut, and the road was going to go through the property right where SAIA's fuel tanks were located. Moreover, according to Russell, the location of the road prohibited SAIA from operating out of four doors that it needed at the north end of the terminal because the trucks would not have enough room to turn into the doors. Russell called Davis, and told him what the City was doing.

{7} Davis said that Russell was very agitated when he learned of the City's planned condemnation. Davis immediately called Pack who said he was not aware of any condemnation by the City, and this was the first he had heard anything of the sort. The thirty-foot strip to be condemned went right through the middle of the fuel tanks, which required their removal at a cost of $50,000 to $60,000. This made SAIA's operation on the Hawkins Property untenable, solidifying SAIA's decision to leave. SAIA remained at the Hawkins Property on a month-to-month basis until it found a new site and vacated the premises on April 30, 2012—two months after the lease expired.

**II.    The Hawkins Property Condemnation Litigation**

{8} The City filed its complaint for condemnation on July 10, 2013, to acquire the thirty-foot strip of land and a construction easement along the northern

6

boundary line of the Hawkins Property to construct a road, together with a jury demand. After the City deposited $143,850 with the clerk of the district court, which it asserted was just compensation for the taking, the City was granted "full possession and occupancy and the right to . . . work on the property[,]" with the district court further ruling that "the only remaining issue is the just compensation due to Defendants." Defendants' answer denied that $143,850 was just compensation, and affirmatively asserted, in part, that the City's condemnation actions proximately caused SAIA not to renew its lease with SMP, resulting in an inverse condemnation and consequential damages in a sum to be proven at trial.

{9}     The City filed a motion for summary judgment on two grounds. First, that Defendants' expectation that the SAIA lease would be renewed did not constitute a compensable property right. Associated with this motion, the City also filed two motions in limine: (1) to prohibit Defendants' expert, Brian Godfrey, from including the value of the SAIA lease in his calculation of Defendants' damage claim; and (2) to prohibit Pack as the principal of SMP from testifying on the value of the SAIA lease as an element of damages or the economic loss to the freight truck terminal building, which resulted from losing the SAIA lease. Second, the City contended that its precondemnation actions did not substantially interfere with SMP's use of the Hawkins Property and, therefore, there was no inverse condemnation. The district court granted the City's motions.

7

{10} The order granting the City's motion for summary judgment was subsequently amended to add that SMP conceded "for purposes of summary judgment only," pursuant to a concurrently filed judgment, that $149,850 was "just compensation" for the City's taking. The order provided further that SMP made the concession "only for the purpose of obtaining a final judgment, under a full reservation of rights to contest and appeal the [district c]ourt's grant of summary judgment."

{11} A stipulated final judgment for condemnation was filed concurrently with the amended order on the City's motion for partial summary judgment. In the stipulated final judgment for condemnation, the district court made a finding that SMP had fully reserved its rights to appeal from the amended order on the City's motion for partial summary judgment, that the parties had "reached a settlement of the remaining disputes in [the] case[,]" and that judgment should be entered on the stipulation of the parties in favor of SMP in the amount of $149,850, and in favor of the City condemning and appropriating the thirty-foot wide strip of land from the northern edge of the Hawkins Property. Judgment was entered accordingly "subject to the reservation of rights to appeal set forth above." Defendants appeal.

**DISCUSSION**

{12} This appeal raises the following issues: (1) whether an appeal lies from the stipulated final judgment; (2) whether the district court erred in granting the City

8

summary judgment in ruling that the value of the SAIA lease is not an element of damages, and whether as a result, the district court erred in precluding the testimony of Godfrey and Pack; and (3) whether the district court erred in granting the City's motion for partial summary judgment on Defendants' claim for inverse condemnation.

## I.      Appeal From the Stipulated Final Judgment

{13}      In our notice of assignment of this case to the general calendar, we requested that the parties brief the issue of "whether a party may appeal from a stipulated final judgment like the one in this case" in light of *Gallup Trading Co. v. Michaels*, 1974-NMSC-048, ¶¶ 4-5, 86 N.M. 304, 523 P.2d 548, and *Kysar v. BP American Production Co.*, 2012-NMCA-036, ¶ 17, 273 P.3d 867. Whether an order is appealable presents a question of law that we review de novo. *Kysar*, 2012-NMCA-036, ¶ 11.

{14}      Generally, "a party cannot appeal from a judgment entered with its consent." *Id.* ¶ 13. The general rule is illustrated by *Gallup Trading Co.*, 1974-NMSC-048, ¶ 5, in which we held that when the defendant consented to the entry of summary judgment against him, he "acquiesced in the judgment and lost his right to appeal." We applied the general rule that

>       [a] judgment by consent is in effect an admission by the parties that
>       the decree is a just determination of their rights on the real facts of the
>       case had they been found. It is ordinarily absolutely conclusively

9

between the parties, and cannot be appealed from or reviewed on a writ of error.

*Id.* ¶ 4 (internal quotation marks and citation omitted).

**{15}** In *Kysar*, we recognized an exception to the general rule prohibiting an appeal from a consent judgment when certain conditions are satisfied. The plaintiffs made several claims against the defendant and demanded a jury. 2012-NMCA-036, ¶ 7. After the jury was chosen, the district court made a ruling that the plaintiffs could not mention certain matters in their opening statement, and the plaintiffs stated that in light of that ruling, and others made in limine, the plaintiffs were unable to present their case to the jury. *Id.* ¶ 8. After discussion, the district court approved the parties' stipulation that in light of the district court's prior decisions and evidentiary rulings, a reasonable jury would not have an evidentiary basis to find in favor of the plaintiffs on any of their claims, and that the defendant was entitled to judgment as a matter of law. *Id.* ¶ 9. The parties further stipulated that the plaintiffs reserved their right to challenge the district court's decisions and rulings on appeal. *Id.* On appeal, we characterized this order as a "stipulated conditional directed verdict" and held that an appeal will lie from such a stipulated judgment when the following conditions are satisfied:

> (1) rulings are made by the district court, which the parties agree are dispositive; (2) a reservation of the right to challenge those rulings on appeal; (3) a stipulation to entry of judgment; and (4) approval of the stipulation by the district court.

10

*Id.* ¶¶ 11-12, 17.

{16} Concluding that *Kysar* is on point, we determine that Defendants reserved their right to appeal from the stipulated final judgment. First, Defendants contend, and the City does not dispute, that the rulings contained in the amended order granting the City partial summary judgment and orders precluding Godfrey and Pack's testimony on the issue of just compensation were dispositive of the case. Specifically, these rulings had the effect of entirely dismissing SMP's claim of inverse condemnation and just compensation in the form of damages to SMP resulting from the company's loss of rental payments from SAIA caused by the City's taking.

{17} Second, Defendants expressly reserved their right to challenge the district court's ruling granting the City partial summary judgment. The stipulated final judgment states that the district court recognizes that SMP "has fully reserved its rights to appeal the [district court's] granting of Petitioner City's [m]otion for [p]artial [s]ummary [j]udgment as set forth in the concurrently filed [a]mended [o]rder on the City's [m]otion for [p]artial [s]ummary [j]udgment[.]" The stipulated final judgment further states that judgment for the award of just compensation is complete, "subject to the reservation of rights to appeal set forth above."

**{18}** Third, through the stipulated final judgment, the parties stipulated to the entry of a final judgment in favor of the City's position on the issue of inverse condemnation and just compensation. Fourth, the stipulated final judgment was approved by the district court.

**{19}** Accordingly, we conclude that the *Kysar* conditions for permitting appeal from a stipulated judgment are satisfied in this case, and we proceed to consider the merits of the appeal.

## II. The District Court's Rulings Granting Summary Judgment

### A. Standard of Review

**{20}** The appeal before us stems from the order of the district court granting the City summary judgment. "We review an order granting summary judgment de novo." *Santa Fe Pac. Tr., Inc. v. City of Albuquerque* (*SFPT*), 2014-NMCA-093, ¶ 16, 335 P.3d 232. "Summary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Id.* (internal quotation marks and citation omitted); *see* Rule 1-056(C) NMRA ("The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."). "Summary judgment is foreclosed either when the record discloses the existence of a genuine controversy

12

concerning a material issue of fact, or when the district court granted summary judgment based upon an error of law." *Vives v. Verzino*, 2009-NMCA-083, ¶ 7, 146 N.M. 673, 213 P.3d 823. New Mexico courts "view summary judgment with disfavor, preferring a trial on the merits." *Little v. Baigas*, 2017-NMCA-027, ¶ 6, 390 P.3d 201 (internal quotation marks and citation omitted); *see Blauwkamp v. Univ. of N.M. Hosp.*, 1992-NMCA-048, ¶ 10, 114 N.M. 228, 836 P.2d 1249 ("Summary judgment is a drastic remedial tool which demands the exercise of caution in its application."). Accordingly, in our review of a summary judgment record, the evidence tendered by parties opposing summary judgment is viewed in the light most favorable to support a trial on the merits. *See Bank of N.Y. v. Reg'l Hous. Auth. For Region Three*, 2005-NMCA-116, ¶ 26, 138 N.M. 389, 120 P.3d 471.

**B.    Lost Rents as Damages**

{21}    Defendants contend that the district court erred in ruling that "the value of the SAIA lease is not a compensable element of damage for a partial taking under NMSA 1978, [Section] 42A-1-26 [(1981)]" and granting the City summary judgment on this claim for damages. Related to this order, the district court also granted the City's motions to exclude testimony of Godfrey, Defendants' expert, and SMP's owner, Pack, on the lost SAIA lease as part of the damages. Defendants contend that these orders were also erroneous and must also be reversed. After first

13

examining the basis for the district court's orders, we explain why the district court erred under the circumstances of this case and reverse.

{22} Section 42A-1-26 provides, in pertinent part,

> In any condemnation proceeding in which there is a partial taking of property, the measure of compensation and damages resulting from the taking shall be the difference between the fair market value of the entire property *immediately before* the taking and the fair market value of the property remaining *immediately after* the taking.

(Emphasis added.) The district court ruled that the SAIA lease could not be considered in calculating "the fair market value [of the entire SMP property] *immediately before* the taking" because there was no lease between SAIA and SMP when the thirty-foot wide strip was "taken" by the City. (Emphasis added.) The "taking" was either on August 6, 2013, when the preliminary order of entry was granted to the City, or November 15, 2013, when the permanent order of entry was granted to the City. The SAIA lease had already expired on February 28, 2012, and SAIA stayed at the Hawkins Property on a month-to-month basis until it found a new site and vacated the premises two months later on April 30, 2012. This reasoning fails to take into account that there is a disputed issue of fact about whether the City's actions caused SAIA not to renew its lease with SMP, causing damages to the value of SMP's property. The City cannot, consistent with our constitutional takings clause, engage in such precondemnation action which damages the value of property, without paying just compensation for that

14

diminished value when it subsequently condemns the property, notwithstanding the express language of Section 42A-1-26.

{23} "Private property shall not be taken or damaged for public use without just compensation." N.M. Const. art. II, § 20. We herein refer to this provision in our Constitution as the State Takings Clause. The concept of "property" that is protected by the State Takings Clause includes all of the interests included in "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it." *Primetime Hosp., Inc. v. City of Albuquerque*, 2009-NMSC-011, ¶ 19, 146 N.M. 1, 206 P.3d 112 (quoting *United States v. Gen. Motors, Corp.*, 323 U.S. 373, 377-78 (1945)). Notably, the State Takings Clause applies when property is "taken or damaged" and therefore provides broader protection than its federal counterpart in the Fifth Amendment, which only applies to property that is "taken." *See* U.S. Const. amend. V (providing that "private property [shall not] be taken for public use[] without just compensation"). Finally, we observe that our Supreme Court has directed that the "objective in a condemnation case is to compensate the landowner for damages actually suffered" and that "if loss of value can be proven, it should be compensable regardless of its source." *City of Santa Fe v. Komis*, 1992-NMSC-051, ¶ 11, 114 N.M. 659, 845 P.2d 753.

15

{24}     With the foregoing principles in mind, we begin our analysis with *City of Buffalo v. George Irish Paper Co.*, 299 N.Y.S.2d 8 (N.Y. App. Div. 1969). That case involved the condemnation of a lot with a five-story building that had been fully occupied until the city publicized plans to condemn the property, notified tenants by letter and telephone that it would soon take the property, and took other actions which caused the owner to lose most of its substantial tenants. *Id.* at 11. The property was subsequently condemned, and the question on appeal was whether the actual rents at the time of trial reflected the true value of the property. *Id*. at 13-14. Citing several cases, the court held that the city should not be permitted to damage and diminish the property's value and then benefit from the loss it caused by evaluating its value as of the condemnation trial date on the basis of the reduced value. *Id*. at 14. The same court subsequently held that when the appropriating sovereign engages in "affirmative value-depressing acts" that cause tenants to move from property it then condemns, the state "should not be permitted to benefit from any loss sustained by [the owner] as the result of [its] acts[.]" *Niagara Frontier Bldg. Corp. v. State*, 305 N.Y.S.2d 549, 552 (N.Y. App. Div. 1969).

{25}     In *Klopping v. City of Whittier*, 8 Cal.3d 39, 500 P.2d 1345 (in bank), the court noted that, while the statutory valuation date in a condemnation case in California is when the summons is issued, "a different date may be required in

16

order to effectuate the constitutional requirement of just compensation." *Id.* at 1349. The court recognized that a condemnee may be required to bear incidental losses as a result of the condemning authority making precondemnation announcements to allow for meaningful public input into condemnation decisions. *Id.* at 1354-55.

> However, when the condemner acts unreasonably in issuing precondemnation statements, either by excessively delaying eminent domain action or by other oppressive conduct, our constitutional concern over property rights requires that the owner be compensated. This requirement applies even though the activities which give rise to such damages may be significantly less than those which would constitute a de facto taking of the property so as to measure the fair market value as of a date earlier than that set statutorily[.]

*Id.* at 1355. Therefore, the court held,

> a condemnee must be provided with an opportunity to demonstrate that (1) the public authority acted improperly either by unreasonably delaying eminent domain action following an announcement of intent to condemn or by other unreasonable conduct prior to condemnation; and (2) as a result of such action the property in question suffered a diminution in market value

*Id*. Addressing damages, the court said that because "rent is an appropriate criterion for measuring fair market value[,]" if rental income is lost as a result of the public authority's improper conduct, "the anticipated rental income would be diminished and a decline in the fair market value would follow." *Id.* at 1356.

{26} Alaska and Washington also recognize that when the state's precondemnation actions effectively deprive the owner of the economic advantages

17

of ownership, such as the right to use and alienate property, "early valuation" of condemned unimproved property is constitutionally required if a four-part test is satisfied. *See Lange v. State*, 547 P.2d 282, 288 (Wash. 1976) (en banc) ( "[M]arketability must be substantially impaired and the condemning authority must have evidenced an unequivocal intention to take the specific parcel of land. The special use of the land by the owner must be acquiring and holding the property for subsequent development and sale. Further, the owner must have taken active steps to accomplish this purpose."); *Ehrlander v. State Dep't of Transp. & Pub. Facilities*, 797 P.2d 629, 635(Alaska 1990) (same).

{27} We find the foregoing cases persuasive and in keeping with the State Takings Clause in New Mexico's Constitution. First, the takings clauses in the California and Alaska constitutions, like New Mexico's, constitutionally require just compensation to be paid when private property is "taken or damaged" for public use, and it is this broader protection that those courts were construing. *See Klopping*, 500 P.2d at 1349; *Ehrlander*, 797 P.2d at 633. Second, Washington, like New Mexico, applies a broad, expansive concept of "property" in its takings clause. *See Lange*, 547 P.2d at 285 (stating "property" includes not only its ownership and possession, but also includes the "unrestricted right of use, enjoyment and disposal" (internal quotation marks and citation omitted)). Finally, an award of "early valuation" damages in appropriate cases is consistent with our

18

Supreme Court's directive in *Komis* that when loss of value is proven, "it should be compensable regardless of its source." 1992-NMSC-051, ¶ 11. The concept of "damage" under the State Takings Clause certainly includes the loss of tenants and a reduction in fair market value resulting from precondemnation conduct by a condemning authority. A condemning authority should not be allowed to engage in deliberate activity causing a reduction in the fair market value of property, and then purchase the same property at the depressed value.

{28}    We conclude that a property owner is constitutionally entitled to "early valuation" fair market value damages—that is, fair market value that occurs before the condemnation action is actually filed and the property actually taken—when (1) the condemning authority has, prior to instituting formal condemnation proceedings, evidenced an unequivocal intention to take the specific parcel of land, and (2) the condemning authority's communication of its intention to third parties or the public in general substantially impacts the fair market value of the property.

{29}    For the foregoing reasons, we reverse the district court's order granting the City summary judgment on Defendants' claims for damages resulting from the loss of the SAIA lease, as well as the order prohibiting  Godfrey and Pack, from testifying on this element of damages. There are disputed issues of material fact on whether the City engaged in precondemnation conduct that would allow loss of the SAIA lease to be included in the calculation of loss in market value to the Hawkins

19

Property. *Cf. SFPT*, 2014-NMCA-093, ¶ 41 (stating that the city did not "substantially interfere" with landowners' use and enjoyment of its property where it never contacted existing or future tenants); *Joseph M. Jackovich Revocable Tr. v. State Dep't of Transp.*, 54 P.3d 294, 298 (Alaska 2002) (stating that "notifying tenants they would have to vacate" constitutes evidence the state "actively interfered with the beneficial use" of property). This is a damages claim to be decided by the jury.

**C.      Substantial Interference in Inverse Condemnation**

{30}      Defendants contend that the district court erred in granting the City's motion for partial summary judgment on their claim for inverse condemnation. Defendants argue that, because there are issues of material fact about whether the City's precondemnation activities constitute substantial interference with their property rights in the Hawkins Property, summary judgment in favor of the City was improper. We agree.

{31}      The constitutional protection afforded property ownership by the State Takings Clause is codified in NMSA 1978, Section 42A-1-29(A) (1983), which provides:

> A person authorized to exercise the right of eminent domain who has taken or damaged or who may take or damage any property for public use without making just compensation or without instituting and prosecuting to final judgment in a court of competent jurisdiction any proceeding for condemnation is liable to the condemnee . . . for the

20

> value thereof or the damage thereto at the time the property is or was taken or damaged[.]

The statute gives express recognition to a cause of action for inverse condemnation. An inverse condemnation claim is available to a property owner when private property has been taken or damaged by a public entity for a public use and the public entity has not paid just compensation or brought a formal condemnation proceeding. *See Moongate Water Co. v. City of Las Cruces*, 2014-NMCA-075, ¶ 7, 329 P.3d 727; *see also North v. Pub. Serv. Co. of N.M.*, 1983-NMCA-124, ¶ 9, 101 N.M. 222, 680 P.2d 603 (noting that if the government "has taken or damaged property for public use without making just compensation therefor or without initiating proceedings to do so, the property owner has recourse through inverse condemnation proceedings").

{32}    Notably, the State Takings Clause and Section 42A-1-29(A) both apply when property is "taken or damaged." Because the concept of "property" that is protected by the State Takings Clause includes all of the interests included in "the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it[,]" *Primetime Hosp., Inc.*, 2009-NMSC-011, ¶ 19 (internal quotation marks and citation omitted), in an inverse condemnation case, "an actual physical taking of property is not required[,]" *SFPT*, 2014-NMCA-093, ¶ 27, "it being sufficient if there are consequential damages." *Bd. of Cty. Commr's v. Harris*, 1961-NMSC-165, ¶ 5, 69 N.M. 315, 366 P.2d 710. But not all

21

consequential damages are compensable in an inverse condemnation case. "[I]n order to be compensable, a taking of or damage to property must invade some substantive or intrinsic aspect of a landowner's right to the use and enjoyment of its property. An incidental economic loss is not sufficient." *SFPT*, 2014-NMCA-093, ¶ 30.

{33}     In *SFPT* we considered "the question whether pre[]condemnation publicity and planning can give rise to a cognizable action for inverse condemnation[.]" *Id*. In concluding that such conduct may result in inverse condemnation, we adopted the two-part inquiry established in *Jackovich* to determine if a public entity's precondemnation publicity and planning constitutes a "taking" and therefore gives rise to an inverse condemnation claim. *SFPT*, 2014-NMCA-093, ¶ 37. That inquiry is "(1) whether the government [has] publicly announced a present intention to condemn the property in question; and (2) whether the government [has] done something that substantially interferes with the landowner's use and enjoyment of its property." *Id.* ¶ 25 (alterations, internal quotation marks, and citation omitted).

{34}     In *SFPT*, the owner leased approximately 66.26 percent of the leasable space in its building to a related entity with the same shareholders, directors, and corporate officers. *Id.* ¶ 3. Beginning in 1999 and continuing through 2008, the city of Albuquerque targeted the owner's property for condemnation to build a downtown arena. *Id.* ¶¶ 4-9. Among its actions, the city engaged in extensive

22

planning, issued requests for information from interested developers, issued a request for proposal, approved a memorandum of understanding to finance the project, presented the plan to the city council, and at one time announced that construction on the arena was imminent. *Id.* From 1999 through 2007, local newspapers published several articles about the proposed arena, with many mentioning the owner's property as a potential site for the proposed arena. *Id.* ¶ 10. However, the city council never approved buying or condemning the property or appropriated funds to construct the arena. *Id.* From 2004 to 2008, several parties considered buying or leasing all or part of the owner's property, then declined. *Id.* ¶ 11. Some lost interest in the property because of the city's threatened condemnation, while others had different reasons, and some did not explain why. *Id.* During that same time, the leases with the related entities remained in place. *Id.*

{35} On the basis of the foregoing undisputed material facts and its conclusion that neither prong of the two-part *Jackovich* test was satisfied, the *SFPT* district court granted summary judgment in favor of the city on the owner's inverse condemnation claim. *SFPT*, 2014-NMCA-093, ¶¶ 14, 25. We concluded that the facts satisfied the first part of the *Jackovich* test because the city "intended to condemn the [p]roperty as soon as it was able to obtain financing, an agreement with a developer, and, importantly, approval of everything by the city council." *SFPT*, 2014-NMCA-093, ¶ 39. However, we affirmed the order granting summary

judgment, concluding that the owner "failed to establish that the [c]ity's actions substantially interfered with [the owner's] use and enjoyment of the [p]roperty." *Id*. We reasoned that the owner leased approximately 66.26 percent of the leasable space in its building, and the city's planning activities, had no effect on those leases. *See id.* ¶¶ 3, 11, 41. Specifically, while the owner might have leased more space were it not for the city's planning and the attendant publicity, those activities did not cause it to suffer a loss. *See id.* We therefore held that, while the evidence demonstrated that some *potential* tenants were deterred by the *possibility* of imminent condemnation, this did not rise to the level of an unconstitutional damage or taking of property. *Id.* ¶ 41.

{36}     Here, the City conceded, and the district court ruled, that the first element for inverse condemnation adopted in *SFPT* was satisfied. However, the district court ruled that the second element was not. In granting summary judgment in favor of the City, the district court said,

> Even if the [district court] were to assume the City's pre[]condemnation activities caused a tenant not to renew their lease, there is no evidence that the City imposed a 'direct restriction on the use of the property' pursuant to the language used in [*SFPT*]. Accordingly, the City is entitled to summary judgment on SMP's inverse condemnation claim.

The language in *SFPT* that the district court referred to was the following: "All government actions will have some incidental economic consequences, and anyone owning property near the site of such activity will bear the risk of those

24

consequences. But unless the government's actions directly restrict the use of that property, the property owner is not entitled to compensation for those actions." *Id.* ¶ 42.

{37} We conclude that the district court's reliance on the foregoing language was misplaced. The language was not necessary to our decision in *SFPT*. Further, on its face, the statement refers to property suffering "some incidental economic consequences" because it is "near the site" of government action, which is not the case here. *Id.* Finally, the statement that the government's actions must "directly restrict the use of that property" requires more than the test we adopted in *SFPT* for an inverse condemnation to result from governmental precondemnation activity. *Id.* Specifically, if governmental activity "substantially interferes with the landowners' use and enjoyment of its property[,]" the result is an inverse condemnation (assuming the first requirement is also satisfied). *Id.* ¶ 25 (alterations, internal quotation marks, and citation omitted). Governmental action that does not "directly restrict" the use and enjoyment of property may, nevertheless, "substantially interfere[]" with the use and enjoyment of property. *Id.* ¶¶ 25, 42.

{38} The test, again, is one of "substantial interference" by the government. Under our standard of review, the summary judgment record shows that the City's right-of-way coordinator went to the Hawkins Property, and knowing he was

25

talking to the tenant and not the owner, told SAIA that the City was going to cut a road through the property in the middle of SAIA's fuel tanks. The fuel tanks, which SAIA paid $180,000 to install, would have to be removed, and the removal itself would cost $50,000 to $60,000. In addition, the location of the road prevented SAIA from using four doors it was leasing. This made SAIA's operation on the Hawkins Property untenable, making it necessary to leave the property without renewing its lease with SMP as previously planned. As a result, when SAIA left, SMP lost a tenant that had intended to lease twenty-nine doors in its freight terminal for an additional nine years.

{39} A jury could find as a matter of fact that the lease was agreed upon and was going to be renewed for an additional nine years, pending completion of the usual paperwork. Under the circumstances, SMP was entitled to have a jury decide whether the City's actions "substantially interfered" with SMP's use and enjoyment of its property, and if so, SMP's damages. *See SFPT*, 2014-NMCA-093, ¶ 41 (stating there was no substantial interference because the city "never contacted existing or prospective tenants"); *Jackovich*, 54 P.3d at 297-98 (noting there was no evidence the state actively interfered with the beneficial use of property by "notifying tenants they would have to vacate[.]"); *City of Detroit v. Cassese*, 136 N.W.2d 896, 899-900 (Mich. 1965) (concluding that a city sending letters to tenants, causing them to move, falls within the category of acts that

26

constitutes a taking). Unlike *SFPT*, the City's actions did not deter a mere *potential* tenant by the *possibility* of imminent condemnation.

{40} We therefore hold that the district court erred in granting the City partial summary judgment on the issue of substantial interference in Defendants' claim for inverse condemnation. *See San Diego Metro. Transit Dev. Bd. v. Handlery Hotel, Inc.*, 86 Cal. Rptr. 2d 473, 484 (Cal. Ct. App. 1999) (stating that what constitutes a direct and substantial impairment of property rights is a question of fact); *State ex rel. Dep't of Transp. v. Barsy*, 941 P.2d 971, 976 (Nev. 1997) (stating that whether there has been unreasonable action by the condemnor is a question of fact), *overruled on other grounds by GES, Inc. v. Corbitt*, 21 P.3d 11 (Nev. 2001).

{41} On remand, Defendants are required to prove to the satisfaction of the jury(1) that there was an inverse condemnation under the requirements of *SFPT*; (2) the date of the "taking"; and (3) damages. The damages on this claim may very well duplicate the "early valuation" damages on the City's condemnation claim because the date of the "taking or damage" may be identical under each claim. If both claims are submitted to the jury, Defendants will not be entitled to recover the same damages under both claims.

**CONCLUSION**

{42} The orders of the district court granting the City summary judgment and prohibiting testimony on damages cause by the loss of the SAIA lease are reversed.

27

{43}    **IT IS SO ORDERED.**

_____
**MICHAEL E. VIGIL, Judge**

**WE CONCUR:**

_____
**HENRY M. BOHNHOFF, Judge**

_____
**STEPHEN G. FRENCH, Judge**