# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number: 2021-NMSC-011

Filing Date: February 25, 2021

No. S-1-SC-37343

CITY OF ALBUQUERQUE,
A municipal corporation,

   Petitioner-Petitioner,

v.

SMP PROPERTIES, LLC, and
R. MICHAEL PACK,

   Respondents-Respondents,

and

MODERN WOODMEN OF AMERICA;
SAIA MOTOR FREIGHT LINE, LLC;
UNITED PARCEL SERVICE, INC.;
COUNTY OF BERNALILLO;
TAXATION AND REVENUE DEPARTMENT
FOR THE STATE OF NEW MEXICO; and
ANY AND ALL CLAIMANTS FOR THE
PROPERTY INVOLVED,

   Respondents.

ORIGINAL PROCEEDING ON CERTIORARI
Nancy J. Franchini, District Judge

Released for Publication April 6, 2021.

Esteban A. Aguilar Jr., City Attorney
Adam Leuschel, Assistant City Attorney
John E. DuBois, Assistant City Attorney
Albuquerque, NM

for Petitioner

Dubois, Cooksey & Bischoff, P.A.
William J. Cooksey
George A. Dubois

Albuquerque, NM

for Respondents

**OPINION**

**THOMSON, Justice.**

**{1}** As part of a project to construct a new road along the North Diversion Channel, the City of Albuquerque (Albuquerque) initiated a condemnation proceeding to acquire a thirty-foot-wide strip of land across a 9.859-acre property (Property) owned by SMP Properties, LLC, whose managing member is R. Michael Pack (collectively, SMP). The district court granted Albuquerque entry and ordered the distribution of $143,850 to SMP as "just compensation" for the condemned property.

**{2}** SMP asserted that it did not receive full compensation because, prior to initiating the condemnation action, Albuquerque directly communicated its intent to condemn a portion of the Property to one of SMP's tenants, SAIA Motor Freight Line, LLC (SAIA). Hearing of Albuquerque's intent to condemn, SAIA apparently decided not to renew its lease before Albuquerque filed the contemplated condemnation action, determining that the condemnation would disrupt its operation and use of the portion of the Property it leased. Based on Albuquerque's precondemnation communications with SAIA and SAIA's subsequent failure to renew its lease, SMP asserted an inverse condemnation claim against Albuquerque seeking consequential damages, including lost rental income and devaluation of the Property adjacent to the thirty-foot wide strip that Albuquerque condemned. Albuquerque moved for partial summary judgment on SMP's "claims for consequential damages relating to the loss of potential tenant leases." The district court granted Albuquerque summary judgment and concluded that Albuquerque's precondemnation activity did not constitute "substantial[] interfere[nce] with the landowner's use and enjoyment of the [P]roperty," and therefore, no taking (in the form of an inverse condemnation) occurred.

**{3}** The Court of Appeals reversed the district court, determining that there were disputed issues of material fact concerning (1) whether Albuquerque's precondemnation activity constituted substantial interference and (2) whether the "loss of the SAIA lease [could] be included in the calculation of loss in market value," which is to say whether the loss of the lease was attributable to a taking. *City of Albuquerque v. SMP Properties, LLC*, 2019-NMCA-004, ¶¶ 28-29, 40, 433 P.3d 336. Although we do not adopt the reasoning of the Court of Appeals, we nonetheless affirm the reversal of the grant of partial summary judgment.

## I.    BACKGROUND

**{4}** SMP leased its Property on the north side of Albuquerque to two tenants. Both tenants operate freight truck terminals out of a single building on the Property. A total of sixty-five terminal bay doors operate on the Property. SAIA leased and operated twenty-nine of the sixty-five terminal doors from 2003 until it terminated its lease.

{5}     SAIA entered into its original lease with SMP in March 2003 and subsequently exercised two three-year options to extend the lease. Because of the two extensions, the lease was set to expire on February 28, 2012. Between 2009 and 2010, SAIA sought and received permission to install two fuel tanks on its leased portion of the Property at its own expense. SAIA had a company policy that it would not install fuel tanks at locations unless it intended to remain there as a tenant for a minimum of eight years after installation, ostensibly to justify the $180,000 cost of installation.

{6}     As a new term or extension date approached, SAIA and SMP's custom was to negotiate any desired changes to the lease terms. At the close of negotiations, SAIA would draft a letter documenting any changes to the lease and send it to SMP. SMP would then ratify and return the letter to SAIA. In continuance of that custom, in December 2011, the last quarter of the last year of the second lease extension period, SAIA's property manager told SMP that SAIA wanted to extend the lease for three more years, with additional options to renew or extend. SAIA committed to producing and delivering a letter concerning the terms to SMP.

{7}     However, after these negotiations began but prior to SMP's receipt of the expected letter from SAIA, Albuquerque's right-of-way coordinator came to the Property and discussed, with an SAIA employee, the North Diversion Channel Road Project and the intended condemnation of the strip of land across the Property. SMP was not aware of the intended condemnation when Albuquerque's right-of-way coordinator visited with the employee of SAIA.

{8}     Through that conversation with the Albuquerque employee, SAIA learned that Albuquerque's intended partial acquisition of the Property would require the removal of the fuel tanks SAIA had installed. The removal of these tanks would cost SAIA approximately $50,000 to $60,000. In addition, the partial taking would also likely prevent SAIA from fully utilizing four of its leased terminal doors. Although SMP sent a letter to SAIA, SAIA ultimately did not send a signed copy back to SMP to enter into a new lease term. Instead, SAIA remained as a holdover tenant at the expiration of the lease, finally terminating its lease on March 30, 2012, and vacating the Property on April 30, 2012. SMP did not know of Albuquerque's intent to acquire part of the Property until SAIA decided to terminate its lease. More than a year after the conversation between the right-of-way coordinator and the SAIA employee, Albuquerque filed a complaint for condemnation. *See* NMSA 1978, § 42-2-1 (1959) (providing for a "special [alternative condemnation] procedure whereby the state can enter into possession at the inception of the proceeding").

{9}     As part of a special statutory procedure in the district court, Albuquerque requested possession of the condemned portion of the Property at the inception of the proceeding and deposited $143,850 as "just compensation" for the condemnation. *See* NMSA 1978, § 42-2-6(A) (1966) (requiring the "filing of the surety bond and deposit of money with the court" if a preliminary order of entry is sought). The district court granted Albuquerque a preliminary order of entry and then a permanent right of entry and ordered the disbursement of "the amount of $143,850.00 and any accrued interest" to SMP. SMP was permitted to amend its response to Albuquerque's complaint to add a

claim for inverse condemnation alleging that Albuquerque did not provide just compensation for the damage to the Property based on Albuquerque's taking of a portion of the Property. SMP's inverse condemnation claim focused on Albuquerque's precondemnation activity and asserted that the lost rental payments should be considered in calculating just compensation.

{10}    Albuquerque filed a motion for partial summary judgment and argued that (1) its precondemnation activities did not "substantially interfere" with Landowner's use of the Property, and therefore there was no "inverse condemnation claim"; and (2) SAIA's lease renewal is not compensable. The district court granted Albuquerque summary judgment on the inverse condemnation claim based on these two arguments.

{11}    The Court of Appeals reversed the grant of summary judgment and remanded to allow SMP to prove to a jury "(1) that there was an inverse condemnation under the requirements of [*Santa Fe Pacific Trust v. City of Albuquerque*, 2014-NMCA-003, 335 P.3d 232]; (2) the date of the 'taking'; and (3) damages." *SMP Properties*, 2019-NMCA-004, ¶¶ 28-29, 40-41. We granted certiorari to review the issues presented. We affirm the reversal of summary judgment and clarify why SMP survives dismissal as a matter of law.

## II.    DISCUSSION

{12}    The proper measure of damages in "a partial taking" is "the difference between the fair market value of the entire property immediately before the taking and the fair market value of the property remaining immediately after the taking." NMSA 1978, § 42A-1-26 (1981); *Primetime Hospitality, Inc. v. City of Albuquerque*, 2009-NMSC-011, ¶ 15, 146 N.M. 1, 206 P.3d 112. However, as SMP points out, this is not simply about a partial physical taking (of a thirty-foot-wide strip of land) and instead must be "broadly" conceptualized within "the range of possible temporary takings scenarios." 2009-NMSC-011, ¶¶ 15, 18 (emphasizing avoidance of "attempts to create a measure to be used in all temporary takings cases" (internal quotation marks and citation omitted)). Thus, whether a taking occurred and the proper measure of damages may be more case-specific. *See id.* ¶¶ 16-21.

{13}    The Court of Appeals determined that this case was best conceptualized as a partial taking where it is proper to determine the fair market value "early" on a date prior to the date of entry. *SMP Properties*, 2019-NMCA-004, ¶¶ 28-29. However, given the circumstances and procedural history, this case could also be conceptualized as a temporary partial taking (when SAIA decided to terminate its lease and vacated the Property) and a subsequent partial physical taking (when Albuquerque finally filed a condemnation action). While SMP was compensated for the latter, we must decide if it is entitled to compensation for the former. As this Court has previously observed, a "fundamental justification for inverse condemnation liability is that the public entity, acting in furtherance of public objectives, is taking a calculated risk that damage to private property may occur." *Electro-Jet Tool Mfg. Co., Inc. v. City of Albuquerque*, 1992-NMSC-060, ¶ 23, 114 N.M. 676, 845 P.2d 770 (internal quotation marks and citation omitted). On this point we recall our previous observation that "[o]ur case law

has defined the purposes of just compensation broadly," and we employ "[d]ifferent measures of damages" to accomplish the underlying goal of making an owner "whole and fully indemnify[ing] him." *Primetime Hospitality*, 2009-NMSC-011, ¶ 15. "[I]t is the loss to the condemnee which must guide a court's determination of fair rental value, especially in cases of temporary takings." *Id.* ¶ 22. SMP stipulated that $143,850 was just compensation for Albuquerque's physical taking of the thirty-foot-wide, 0.3578-acre strip, which accounted for approximately four percent of the Property. The question is whether this is full compensation entitling Albuquerque to summary judgment on SMP's inverse condemnation claim involving the loss of its tenant. In considering these concepts and the law, we conclude that the district court erred.

## A.    Standard of Review

{14}    "New Mexico courts . . . view summary judgment with disfavor, preferring a trial on the merits." *Romero v. Philip Morris Inc.*, 2010-NMSC-035, ¶ 8, 148 N.M. 713, 242 P.3d 280. Nevertheless, "[s]ummary judgment is appropriate where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. Where reasonable minds will not differ as to an issue of material fact, [a] court may properly grant summary judgment." *Id.* ¶ 7 (internal quotation marks and citation omitted). On appeal, this Court views the facts in the "light most favorable to the party opposing summary judgment" and will "draw all reasonable inferences in support of a trial on the merits." *Freeman v. Fairchild*, 2018-NMSC-023, ¶ 14, 416 P.3d 264 (internal quotation marks and citation omitted). We review a "district court's grant of summary judgment de novo." *Id.*

## B.    Whether the Precondemnation Activity in This Case Constituted Substantial Interference Is a Question of Disputed Material Fact

{15}    The Court in *Santa Fe Pacific Trust* stated that "whether the facts are enough to constitute a taking is a question of law." 2014-NMCA-093, ¶ 16. Albuquerque uses this statement to argue that "whether a taking occurred is not a question for the jury [i.e., fact-finder] to decide." However, a claim for inverse condemnation "entails complex factual assessments of the purposes and economic effect of government actions" to determine whether "property is taken in the constitutional sense, though the title and possession remain undisturbed." Eugene McQuillin, *The Law of Municipal Corporations* § 32:26, 523-26 & n.6 (3d ed. 2010). The *Santa Fe Pacific Trust* Court's acknowledgement that whether the facts are enough to constitute a taking is a question of law does not mean that a jury plays no role in determining whether "a potential condemnor's damage to property is compensable for purposes of inverse condemnation." *See* 2014-NMCA-093, ¶ 27. A district court may decide as a matter of law that there has been no taking or that as a matter of law the evidence does not establish substantial interference. However, a district court may not dispose of a claim as a matter of law when there are factual questions that must be resolved concerning the purposes and economic effect of government actions.

{16}    "The question of whether there has been a 'taking' when property has been damaged is moot in those states in which the constitution requires compensation to be

made in cases of the damaging of property." McQuillin, *supra*, § 32:27, at 529. "'[I]n order for an owner to be entitled to compensation a [physical] taking is not required—it being sufficient if there are consequential damages.'" *Santa Fe Pacific Trust*, 2014-NMCA-093, ¶ 27 (quoting *Bd. of Cnty. Comm'rs of Lincoln Cnty. v. Harris*, 1963-NMSC-165, ¶ 5, 69 N.M 315, 366 P.2d 710 (interpreting Article II, Section 20 of the New Mexico Constitution). Accordingly, there may be substantial interference based on precondemnation activity even if the governmental actor never actually accomplishes a physical taking. *Id.* Whether there was damage to the Property as a direct consequence of Albuquerque's precondemnation activity—which is to say whether the activity constituted substantial interference—requires a fact-finder to resolve disputed questions of fact. After the fact-finder resolves all relevant factual disputes, or if there are no disputed facts, a court may determine based on those facts whether there was substantial interference as a matter of law. Albuquerque's argument that a court must first make a legal determination that a taking occurred for there to be an inverse condemnation claim under Article II, Section 20 is without merit.

**{17}** SMP alleges that its claim for inverse condemnation arose prior to the actual condemnation of its property and that Albuquerque's actions affected a portion of the Property that was not physically taken: namely the portion leased by SAIA that was not condemned by Albuquerque. Nonetheless, the district court applied *Santa Fe Pacific Trust*, 2014-NMCA-093, ¶¶ 37, 42, in concluding that Albuquerque's "pre-condemnation activities in this case did not constitute a taking" because "there is no evidence that [Albuquerque] imposed a 'direct restriction on the use of the [P]roperty.'" (Citation omitted.)

**{18}** In *Santa Fe Pacific Trust*, 2014-NMCA-093, ¶¶ 30, 33, the Court of Appeals considered whether precondemnation activity "can give rise to a cognizable action for inverse condemnation," adopted the "*Jackovich* two-part inquiry" to answer that question, and concluded that "the district court's reliance on [*Joseph M. Jackovich Revocable Trust v. State of Alaska, Dep't of Transp.*, 54 P.3d 294, 298 (Alaska 2002)] was not misplaced." This two-part inquiry requires a determination that two separate but related *factual* circumstances exist, and if both circumstances are present, a cognizable inverse condemnation claim arises. *Santa Fe Pacific Trust*, 2014-NMCA-093, ¶¶ 33, 37. First, a fact-finder must determine that the government manifested "a present [concrete] intention to condemn specific property." *Id.* ¶ 33. Second, a fact-finder must determine that the government took "action that substantially interfere[d] with the use and enjoyment of the potential condemnee's property." *Id.* The first determination was not before the district court, and it is not at issue in this appeal because, for purposes of summary judgment, Albuquerque conceded that it manifested an intention to condemn a portion of the Property.

**{19}** As to the second determination, the district court assumed that Albuquerque's precondemnation activity caused SAIA "not to renew [its] lease." In consideration of Albuquerque's request to dismiss the claim as a matter of law, the district court determined that even if Albuquerque's precondemnation actions resulted in a loss of rent to SMP, that assumption was not enough for SMP to survive dismissal of its claim. To reach this conclusion, the district court read *Santa Fe Pacific Trust* to limit those

circumstances in which Albuquerque's actions constitute substantial interference. It imposed a narrow but stringent requirement on the condemnee to show that the government placed a direct restriction on the condemnee's use of its property. The district court, quoting *Santa Fe Pacific Trust*, 2014-NMCA-093, ¶¶ 37, 42, concluded that no rational jury could find there was substantial interference in this case, because "there is no evidence that [Albuquerque] imposed a 'direct restriction on the use of the [P]roperty.'"

**{20}** The Court of Appeals rightly took issue with this interpretation. *SMP Properties*, 2019-NMCA-004, ¶ 37 (concluding "that the district court's reliance" on the direct restriction language in *Santa Fe Pacific Trust* "was misplaced"). We take this opportunity to better explain why the district court's misapplication of *Santa Fe Pacific Trust* led it to wrongly conclude that only direct restrictions amount to substantial interference.

**{21}** To begin, because the city as the condemnor in *Santa Fe Pacific Trust* never initiated a condemnation action, the city's precondemnation consisted of "planning activities[] which never came to fruition." 2014-NMCA-093, ¶ 41. In addition, the city never dispossessed the property owner of any property, "never denied [the owner] any use permits," "never enacted any ordinances or regulations" affecting the use of the property, and most significantly, "never contacted existing or prospective tenants." *Id.* Although we acknowledge that "[a]ll government actions will have some incidental economic" impact on property owners, not all precondemnation activity will produce a viable inverse condemnation claim. *See id.* ¶ 42. However, that general rule does not preclude an owner from asserting a taking based on "substantial injury" to a property where the property is not deprived of *all* beneficial use. *See Harris*, 1961-NMSC-165, ¶¶ 5, 9-12 (holding that a change in the grade of a road that substantially injured the value of a property was a compensable taking under the New Mexico Constitution).

**{22}** The *Harris* Court recognized that an inverse condemnation claim could arise without dispossession or the total deprivation of beneficial use, deciding not to proclaim a rule of universal application concerning the "line between non-compensable damage through an exercise of the police power, and damage for which payment must be made for a taking" in favor of "decid[ing] each case as it arises." *Id.* ¶ 11. In other words, where a property owner alleges there has been an unconstitutional taking that is not based on the physical dispossession of property, New Mexico has not established a bright-line rule. Instead we look to the specific circumstances presented to implement the constitutional principle established by Article II, Section 20: "Private property shall not be taken *or damaged* for public use without just compensation." (Emphasis added.)

**{23}** In this case, SMP alleges that Albuquerque directly communicated to SAIA its intent to effect a partial physical taking of the Property and that this act "substantially interfered" with SMP's use and enjoyment of its Property. It is incongruous for the district court to "assume," for purposes of summary judgment, that SAIA's failure to renew its lease was a *direct result* of Albuquerque's precondemnation activities but that Albuquerque was nonetheless entitled to summary judgment because it did not impose a "'direct restriction on the use of the [P]roperty.'"

**{24}**     In addition, the record presents numerous disputed facts that the district court did not consider or ignored, and under the proper standard of review we cannot say summary judgment was proper. For instance, Albuquerque conceded that its right-of-way coordinator had a conversation with an SAIA employee prior to the condemnation action and communicated its intent to condemn part of the Property. The partial taking would effectively prevent SAIA from fully operating four of its twenty-nine terminal doors and would require the removal of fuel tanks that SAIA had installed on the Property. SAIA was a long-term tenant, had expressed an intent to renew its lease, and was under negotiations to continue to operate on the Property for three to nine years. However, Albuquerque's intended condemnation impacted SAIA's operations to a point that SAIA determined it was no longer feasible to continue operations of its freight terminal on the Property. As a result, SAIA terminated its lease in March 2012 and vacated the Property in April 2012. This in turn cost SMP an undetermined but allegedly significant amount of lost profits or rental income. "[V]iew[ing] the facts in a light most favorable to the party opposing summary judgment and draw[ing] all reasonable inferences in support of a trial on the merits," we determine that a rational jury could conclude there was substantial interference in this case. *Philip Morris*, 2010-NMSC-035, ¶ 7 (internal quotation marks and citation omitted).

**{25}**     Albuquerque argues that the actions described by SMP are required by law and therefore could not amount to "substantial interference." *See* NMSA 1978, § 42A-1-4(A) (1981) ("A condemnor shall make reasonable and diligent efforts to acquire property by negotiation."). Albuquerque asserts that its employee's actions were part of its due diligence in preparing for negotiations, ostensibly to "locate and contact the owner of" the Property. Whether the actions taken were reasonable and diligent efforts at negotiation or efforts to devalue the Property by interfering with SMP's existing lease contracts to facilitate the acquisition of a part of the Property is a question of fact, notwithstanding Albuquerque's attempt to cast the determination as a legal issue.

**{26}**     Albuquerque also misconstrues the Court of Appeals as "holding" that Albuquerque's acts constituted "substantial interference." Although the opinion could have been more clear, the Court of Appeals did not hold that there was substantial interference in this case. Instead it concluded, as we do, that the district court's grant of summary judgment was improper because there were disputed material facts that must be determined in order to decide whether Albuquerque's precondemnation acts gave rise to an inverse condemnation claim. *See SMP Properties*, 2019-NMCA-004, ¶¶ 29, 35, 38-40. We agree with the Court of Appeals insofar as it determined that whether there was substantial interference is a question for a fact-finder——in this case, the jury. The district court's grant of partial summary judgment was improper.

**C.     New Mexico Recognizes Consequential Damages in Inverse Condemnation Claims**

**{27}**     Because we hold that summary judgment was improper, it is unnecessary to review the specific Court of Appeals conclusion on the propriety of "early valuation" in this case and its reversal of the "order prohibiting [Pack's real estate appraisal expert] and Pack, from testifying on [the] element of damages." *See SMP Properties*, 2019-

NMCA-004, ¶¶ 21, 28-29. However, it is appropriate to provide some guidance concerning damages because the question of damages is linked to the question of substantial interference in this case.

**{28}** The district court "conclude[d] that the value of the SAIA lease is not a compensable element of damages for a partial taking under NMSA 1978, § 42A-1-26," because the "measure of damages for a partial taking is the difference in the fair market value immediately before the taking and immediately after the taking." We make two observations concerning the district court's statement.

**{29}** First, the conclusion is not accurate. The district court order uses only the first part of Section 42A-1-26, but the statute continues, stating that "[i]n determining [the difference in fair market value], *all elements which would enhance or diminish the fair market value before and after the taking shall be considered* even though some of the damages sustained by the remaining property, in themselves, might otherwise be deemed noncompensable." *Id.* (emphasis added). The plain language of the statute contemplates that the value of an ongoing lease that is terminated because of a taking is a component of value that may be considered in calculating "fair market value." *See id.*; *see also State ex rel. State Highway Comm'n v. Chavez*, 1969-NMSC-072, ¶ 9, 80 N.M. 394, 456 P.2d 868 (determining that a lease that was previously renewed and set to expire could be considered in the compensation calculation in a condemnation action where the lease was "renewed as a matter of course," and that "it was the unanticipated intervention of the condemnation that caused the loss of value").

**{30}** Second, applying only the partial condemnation damages methodology under NMSA 1978, Section 42A-1-24 (2001), may not accomplish the purposes of just compensation in this case. Assuming that SMP establishes that (1) Albuquerque demonstrated a present, concrete intention to condemn specific property and (2) Albuquerque's precondemnation acts amounted to substantial interference that directly resulted in SAIA's lease termination, the district court will have to determine how best to fashion a remedy and instruct the jury on damages. This requires more than a before and after snapshot to determine the value of the official taking (the condemnation) alone.

**{31}** One way to calculate damages would be to determine the diminishment of the "fair market value" based on the *date* the inverse condemnation claim arose prior to Albuquerque's condemnation action. If this damage calculation *date* was the date on which the Property's fair market value no longer included some value that was attributable to SAIA's lease, the method proposed by the Court of Appeals might be proper. *See SMP Properties*, 2019-NMCA-004, ¶ 28. The Court of Appeals opinion proposes this option through analysis of appellate opinions from Alaska, California, New York, and Washington. *See SMP Properties*, 2019-NMCA-004, ¶¶ 24-26 (discussing *City of Buffalo v. George Irish Paper Co.*, 299 N.Y.S.2d 8 (App. Div. 1969); *Klopping v. City of Whittier*, 500 P.2d 1345 (Cal. 1972) (in bank); *Lange v. State*, 547 P.2d 282 (Wash. 1976) (en banc); *Eherlander v. State Dep't of Transp. & Pub. Facilities*, 797 P.2d 629 (Alaska 1990)). These cases appear to apply a similar principle: a governmental actor should not be permitted to engage in willful or deliberate conduct

that damages a property it intends to wholly or partially condemn and thereby obtain the property at a diminished value. While this principle is relevant to determining whether there is substantial interference, it is not clear whether these cases fairly address the full measure of proper damages in the present case.

**{32}** SMP's inverse condemnation claim is based on alleged consequential damage to the Property prior to the condemnation. If the termination of the SAIA lease was directly attributable to Albuquerque's precondemnation activity, it would be compensable even if Albuquerque did not actually follow through with its partial physical taking in this case. *See Harris*, 1961-NMSC-165, ¶¶ 10-12 (recognizing that the government may sufficiently damage a property to justify compensating an owner even without accomplishing a physical taking through condemnation); *Primetime Hospitality*, 2009-NMSC-011, ¶ 22 (observing that "the definite plans of a property owner are a proper consideration in determining the value of the taking"); *accord Santa Fe Pacific Trust*, 2014-NMCA-093, ¶¶ 37-39 (establishing "state law standards for determining whether pre-condemnation planning and publicity constitute damage to or taking of property" when the government does not acquire or condemn the subject property). It may therefore be more appropriate to consider any damages that resulted from the precondemnation interference that gave rise to the "inverse condemnation" claim independent of the calculation for the loss in value based on the partial physical taking. *See Primetime Hospitality*, 2009-NMSC-011, ¶ 15 (observing that the purpose of "just compensation" is to sufficiently cover and "fully indemnify" the loss (internal quotation marks and citation omitted)).

**{33}** For example, in *Primetime Hospitality*, this Court addressed the proper measure of damages for a "temporary total physical taking" and relied on a case concerning a "temporary regulatory taking." *Id.* ¶¶ 16-19 (discussing the reasoning of *PDR Dev. Corp. v. City of Santa Fe*, 1995-NMCA-074, 120 N.M. 224, 900 P.2d 973, to determine whether "lost rents" or "lost profits" could be a proper measure of damages for a temporary taking). The *Primetime Hospitality* Court determined that "[m]arket rental value" seemed "a reasonable way to measure Primetime's compensable loss" because "property as protected by the Takings Clause denotes the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it." 2009-NMSC-011, ¶ 19 (internal quotation marks and citation omitted).

**{34}** Albuquerque bases its argument that the SAIA lease was not a compensable right but instead a "mere expectation" on two cases: *State ex rel. State Highway Comm'n v. Gray*, 1970-NMSC-059, ¶¶ 13-17, 81 N.M. 399, 467 P.2d 725, and *Walker v. United States*, 2007-NMSC-038, 142 N.M. 45, 162 P.3d 882.

**{35}** In *Walker*, this Court determined that owning a water right does not create a right in the surface estate that would entitle the owner to compensation if the federal government cancels that owner's grazing permits for federal land. 2007-NMSC-038, ¶ 31. We do not agree with Albuquerque's characterization of *Walker*'s reasoning or Albuquerque's assertion that *Walker* applies to the circumstances presented in this case.

**{36}** In *Gray*, this Court observed that the "mere expectation" of the renewal of a lease does not entitle a lessee to compensation "based on evidence that the landlord and tenant were mutually satisfied and were likely to" renew the month-to-month lease "where no part of the leased property was taken." 1970-NMSC-059, ¶¶ 13-18 (internal quotation marks and citation omitted). The *Gray* Court's reasoning is not directly applicable to the circumstances alleged to have occurred here. Unlike *Gray*, here there is a question of fact a jury must resolve: whether the government's intended condemnation directly caused SMP to terminate a lease where there was more than a mere expectation of renewal.

**{37}** Accordingly, we do not determine what the proper measure of damages would be in this case. Assessing the proper damages likely turns, at least in part, on the facts and circumstances that must be established at trial, including, but not necessarily limited to (1) whether Albuquerque's precondemnation activity manifested a present intent to condemn in part and substantially interfere with the Property; and if it did, (2) what the resultant damage to the Property was, (3) when that interference occurred, (4) and if the SAIA lease added value to the Property, what that value was, and (5) what SMP has done to mitigate any damages that are attributable to the loss of the SAIA lease.

## III.  CONCLUSION

**{38}** Based on the foregoing, we agree with the determination that summary judgment was improper because there were disputed material facts. We depart from the Court of Appeals holding that "early valuation" would necessarily be the proper measure of damages in this case. We therefore remand to the district court for further proceedings in conformance with this opinion. We instruct the district court in fashioning the appropriate remedy to follow the principle that the loss to the condemnee must guide its determination pursuant to the facts established at trial.

**{39}  IT IS SO ORDERED.**

**DAVID K. THOMSON, Justice**

**WE CONCUR:**

**BARBARA J. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**JUDITH K. NAKAMURA, Justice, Retired**
**Sitting by designation**

**STEVEN BLANKINSHIP, Judge**
**Sitting by designation**