The slip opinion is the first version of an opinion released by the Clerk of the Court of Appeals. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Clerk of the Court for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: June 3, 2026

**NOS. A-1-CA-42309, A-1-CA-42310**

**KALVIN KIEHNE; GREG NASH; DAVID E. JONES and PATRICIA CAROL JONES, TRUSTEES of the DAVID E. JONES AND PATRICIA CAROL JONES REVOCABLE TRUST and ROBERTA ROMERO CHIAPPONE and FRANK A. CHIAPPONE; JENNIFER SWENSON; CLIFFORD STUDDARD; OAK RIDGE FARMS, LLC; and HUGH B. MCKEEN RANCH, LLC,**

      Plaintiffs-Appellees,

v.

**NEW MEXICO DEPARTMENT OF GAME AND FISH and NEW MEXICO STATE GAME COMMISSION,**

      Defendants-Appellants.

**APPEAL FROM THE DISTRICT COURT OF CATRON COUNTY**
**Mercedes C. Murphy, District Court Judge**

Domenici Law Firm, P.C.
Pete V. Domenici, Jr.
Albuquerque, NM

for Appellees

Freedman Boyd Hollander & Goldberg, P.A.
Joseph Goldberg
Albuquerque, NM

Fayerberg Dodd, LLC
Christopher A. Dodd
Amber Fayerberg
Albuquerque, NM

for Appellant New Mexico Department of Game and Fish

Cuddy & McCarthy, P.C.
Aaron Wolf
Santa Fe, NM

for Appellant New Mexico State Game Commission

**OPINION**

**WRAY, Judge.**

{1}     This case involves two interlocutory appeals arising from a single motion for summary judgment. Plaintiffs, seven property owners, filed a complaint against Defendants, the New Mexico Game Commission (the Commission) and the New Mexico Department of Game and Fish (the Department), and alleged that Defendants' mismanagement of the elk population in Catron County had damaged Plaintiffs' properties. Plaintiffs asserted that Defendants' mismanagement effected an unconstitutional taking of their properties and resulted in both a public and a private nuisance. The district court granted Defendants' motion for summary judgment as to Plaintiffs' claim for an unconstitutional taking but denied summary judgment as to Plaintiffs' nuisance claim. Both parties appealed. We conclude that (1) Defendants' conduct does not support a takings claim because any occupation of Plaintiffs' properties by elk is not attributable to Defendants and no private property right has been appropriated by Defendants' management of the elk; and (2) Defendants are not liable for nuisance based on harm caused by the elk, because Defendants' only challenged acts involve the discretionary implementation of the elk management system, which are acts that are duly authorized by law. We therefore hold that summary judgment was appropriate on all of Plaintiffs' claims and affirm in part and reverse in part.

**BACKGROUND**

{2}     Plaintiffs are various property owners and ranchers in Catron County who assert that property damage has resulted from conservation decisions initially made by the state in the early 1900s and 1950s. After New Mexico's native Merriam's elk were hunted to extinction, the state introduced the Rocky Mountain elk (the elk) into this region and built up the population through conservation efforts. At the time the litigation began, the relevant population of the elk, known as the Greater Gila Herd, was estimated to be up to 27,000 animals. Although the parties dispute the specific damage caused by the elk, Defendants concede that the elk have a "transient presence" within Catron County, including on the private properties of Plaintiffs.

{3}     Defendants each have responsibilities in the management of the elk. The Legislature has authorized the Commission to manage protected wildlife through regulation, and the Commission manages the elk through the Elk Rule, the EPLUS program, and the depredation rules. *See* NMSA 1978, § 17-1-26 (1931, amended 2025) (delegating regulatory authority to the Commission); NMSA 1978, § 17-2-1 (2019) (same); 19.30.5.7(M) NMAC (defining "EPLUS" as "elk private lands use system"). The Elk Rule designates the number of available hunting licenses, based on population management objectives. *See* 19.31.14.8 NMAC; 19.31.14.14(E) NMAC (providing for hunting licenses in particular game management units). The EPLUS program is designed "[t]o acknowledge landowners who provide

meaningful benefit to elk and accept elk on their properties and to provide hunting opportunities on private and public land to all elk hunters who wish to recreate within New Mexico's exterior boundaries." 19.30.5.2 NMAC; *see* 19.30.5.8(A)(4) NMAC (providing EPLUS hunting licenses for voluntary participants depending on "harvest objectives" found in the Elk Rule). The regulations also include a depredation assistance program to mitigate damage to private property caused by game animals. *See* 19.30.2.8 NMAC (providing depredation rules). For its part, the Department has statutory authority to issue landowner elk hunting permits, *see* NMSA 1978, § 17-3-14.1 (1989), as well as delegated authority to enforce the Commission's regulations, *see* NMSA 1978, § 17-1-5 (1973) (delegating enforcement authority to the Department); NMSA 1978, § 17-1-9 (1985) (same).

{4}     Plaintiffs filed a complaint and alleged that these regulations (the regulatory program) have resulted in an increase in elk population on private property that amounts to an unconstitutional taking and that the implementation of the regulatory program is a nuisance. Defendants moved for summary judgment and primarily argued that the state cannot be liable for the actions of wild animals. In relevant part, the district court granted summary judgment on the claim for an unconstitutional taking but allowed the nuisance claim to proceed to trial after determining there were "questions of fact as to whether elk constitute a nuisance." Both parties applied for interlocutory review, which this Court granted.

## DISCUSSION

**{5}** "We review a district court's grant of summary judgment de novo." *City of Albuquerque v. SMP Props., LLC*, 2021-NMSC-011, ¶ 14, 483 P.3d 566 (internal quotation marks and citation omitted). Summary judgment is appropriate where there is "no genuine issue as to any material fact" and the movant "is entitled to a judgment as a matter of law." Rule 1-056(C) NMRA. If "reasonable minds will not differ as to an issue of material fact, a court may properly grant summary judgment." *SMP Props., LLC*, 2021-NMSC-011, ¶ 14 (alteration, internal quotation marks, and citation omitted). We view "the facts in the light most favorable to the party opposing summary judgment and will draw all reasonable inferences in support of a trial on the merits," and generally, view summary judgment with disfavor. *Id.* (internal quotation marks and citations omitted). We begin with Plaintiffs' constitutional claim and then evaluate the claim for nuisance.

## I. The Constitutional Claim

**{6}** The New Mexico Constitution guarantees that "[p]rivate property shall not be taken or damaged for public use without just compensation." N.M. Const. art. II, § 20. A "taking" may be instituted through a condemnation proceeding, but "if the condemning authority has taken or damaged property for public use without making just compensation therefor or without initiating proceedings to do so, the property owner has recourse through inverse condemnation proceedings." *Primetime Hosp.,*

*Inc. v. City of Albuquerque*, 2009-NMSC-011, ¶ 14, 146 N.M. 1, 206 P.3d 112 (alteration, internal quotation marks, and citation omitted); *see* NMSA 1978, § 42A-1-29 (authorizing inverse condemnation claims); NMSA 1978, § 17-4-2 (1939) (providing the Commission with eminent domain authority).[1]

{7}     "Takings jurisprudence distinguishes between physical takings and regulatory takings." *State v. Wilson*, 2021-NMSC-022, ¶ 26, 489 P.3d 925. In the present case, Plaintiffs do not raise a regulatory takings claim. *See id.* ¶¶ 26, 29 (explaining that a regulatory taking can occur when a regulation prohibits a property owner from certain uses of their property). We therefore focus on physical takings, which "are categorically compensable and occur whenever the government acquires private property for a public purpose." *Id.* (internal quotation marks and citation omitted). The government effects a physical taking of a property in numerous ways, including "formally" taking title to the property, taking physical possession "without acquiring title," occupying the property through indirect means, or physically interfering with a property owner's ability to use their property. *See Cedar Point Nursery v. Hassid*, 594 U.S. 139, 147-48 (2021); *Wilson*, 2021-NMSC-022, ¶ 25 (noting that "we turn to both state and federal cases for guidance" (alteration, internal quotation marks, and citation omitted)). Plaintiffs invoke the third and fourth principles and argue that

---

[1]The district court dismissed the constitutional claim against the Department early in the proceedings after determining that the "Department does not have the power of eminent domain." This ruling is not at issue on appeal.

Defendants occupied their properties through indirect means (the elk) and through a physical interference with the right to use their properties (the regulatory program and its implementation). We address these arguments in turn, followed by Plaintiffs' suggestion that under the New Mexico Constitution, the fact that their properties were damaged for public use is sufficient to warrant compensation without establishing one of the forms of a physical taking.

## A.     Taking By Indirect Means

{8}     Plaintiffs argue that the physical invasion of the elk, caused by Defendants' implementation of the regulatory program, is a taking through indirect means. Plaintiffs specifically argue that their "properties have been physically appropriated as part of the [s]tate's elk program" and the regulations "caused a physical invasion" resulting in "[e]ntire herds of non[-]native elk—sometimes 500 animals at once—occupy[ing Plaintiffs'] properties for months at a time." Taking by indirect means results from "the government . . . effect[ing] a physical taking when it occupies property—say, by recurring flooding as a result of building a dam." *Cedar Point Nursery*, 594 U.S. at 148. Plaintiffs' view is that Defendants' management of the elk caused an occupation of Plaintiffs' property by the elk. The difficulty with this argument is the well-established principle that an occupation by wildlife is not attributable to the state.

{9}     Long ago, our Supreme Court explained the state's relationship with wild animals:

> All the authorities are to the effect that the state holds title to the wild animals in trust for the people. No individual has any title to any such animal until he reduces it to lawful possession. As trustee for the people, the state through its Legislature may enact laws designed to conserve wild life, and regulate or prohibit its taking in any reasonable way it may deem necessary for the public welfare, so long as it does not violate any organic law of the land.

*State ex rel. Sofeico v. Heffernan*, 1936-NMSC-069, ¶ 16, 41 N.M. 219, 67 P.2d 240. The *Sofeico* Court explained that the Legislature created the Commission to regulate game and fish and entrusted the Commission with "the duty of safeguarding this property in the interest of the public." *Id.* ¶ 26. Because the state is viewed as a trustee for—and not an owner of—wildlife, other jurisdictions have determined that the governments that regulate the well-being of wildlife do not have corresponding liability for the actions of that wildlife. *See, e.g.*, *Corron v. State*, 10 N.Y.S.2d 960, 961 (Ct. Cl. 1939) (holding that the state could not be liable for the damage caused to property owners by cottontail rabbits); *Utah Native Plant Soc'y v. United States Forest Serv.*, 923 F.3d 860, 870-71 (10th Cir. 2019) (noting "mountain goats are ferae naturae" and no trespass by the state occurred because the state did not own the animals "once it released the goats back into the wild"). At least one jurisdiction has stated explicitly that an occupation by wildlife is not a physical taking by the state. *See Moerman v. State*, 21 Cal. Rptr. 2d 329, 331 (Ct. App. 1993) (noting that

"tule elk are not instrumentalities of the state nor controlled by the state, and therefore, there has been no physical taking" of private property by the state); *cf. Mountain States Legal Found. v. Hodel*, 799 F.2d 1423, 1428 (10th Cir. 1986) (rejecting an argument in a regulatory takings case that the protection of wild animals by statute transformed the wild animals into instrumentalities of the government and caused "a permanent governmental occupation"). We similarly conclude that trusteeship over wild animals does not by itself result in an occupation by the state if wild animals occupy private property.

{10}     Plaintiffs focus not on Defendants' stewardship or control over wild animals but on the foreseeability of the harm to private property caused by Defendants' implementation of the regulatory program. Plaintiffs contend that "the State intentionally introduced a non-native elk herd, managed its population to grow dramatically, and knowingly relied on private lands to sustain the herd for public benefit."[2] Because the private lands have features that will attract the elk, Plaintiffs argue that Defendants' management of the elk caused "deliberate" and "foreseeable"

---

[2]Plaintiffs also highlight that the elk belong to a "non-native [elk] herd." The Legislature, however, has designated this species of elk as protected game, and the elk are regulated by the Commission. *See* NMSA 1978, § 17-2-3(A)(4) (2015) (describing as protected "all of the family Cervidae (elk and deer)"). The "non-native" distinction is therefore not relevant. *Cf. Moerman*, 21 Cal. Rptr. 2d at 459 ("Clearly it is unreasonable to argue that because the animals were once eliminated from [the region] and driven to the brink of extinction, that they are now nothing more than a public improvement or pet, under the control of the state.").

damage to private property, based on our Supreme Court's analysis in *Electro-Jet Tool Mfg. Co. v. City of Albuquerque* (*Electro-Jet*), 1992-NMSC-060, 114 N.M. 676, 845 P.2d 770.

{11} In *Electro-Jet*, the plaintiffs brought a takings claim against the city, which had performed work on ditches that caused water to accumulate and damage private property. *Id.* ¶¶ 2-4. The issue was whether a takings claim required a showing that the government intended to cause damage while performing a public purpose. *Id.* ¶¶ 12, 18. The Court determined that a plaintiff must show at least that the government took "a calculated risk that damage to private property may occur," which the Court defined as "knowledge of a substantial probability" of harm to property. *Id.* ¶ 23 (internal quotation marks and citation omitted). In the present case, Plaintiffs apply the *Electro-Jet* test and frame the necessary "calculated risk" as Defendants' introduction of the elk and encouragement of the increase in herd size in an area that abutted private lands that elk might find attractive. *See id.* ¶ 23.

{12} In our view, the *Electro-Jet* test was developed to resolve a different question than is posed by this appeal. The *Electro-Jet* Court considered how culpable a governmental actor must be in order for a property owner to establish a claim for an unconstitutional taking. *Id.* ¶ 22. The issue was not whether the city's work on the ditches caused a physical taking by water occupying private property. The harm in *Electro-Jet* was directly caused by the city—an "occupation" by the water caused

by the work on the ditches. *Id.* ¶¶ 2-3; *see also United States v. Cress*, 243 U.S. 316, 327 (1917) (holding that the occupation of land by permanent backwater overflow due to the government's damming of a river was an unconstitutional taking). In the present case, the elk occupied the properties.

{13} As we have explained, the occupation of the elk—even though the state reintroduced the elk and Defendants manage the elk population—is not generally attributable to Defendants because wildlife and the natural condition of the land is generally out of the government's control. *See Moerman*, 21 Cal. Rptr.2d at 333 ("The majority of courts that have considered the question of whether the government owes compensation for damage to property caused by protected wildlife have held that the government does not."). Thus, Plaintiffs have not established a cause of harm, or an occupation, that is attributable to Defendants. We therefore do not reach the consideration resolved by *Electro-Jet*—whether the government had knowledge of a substantial probability of harm. 1992-NMSC-060, ¶ 22. For these reasons, we conclude that Plaintiff did not establish a taking by indirect means.

**B.    Physical Interference with Property Rights**

{14} Alternatively, a conservation regulation may result in a taking that demands compensation if government action infringes on a fundamental property right. *See Allen v. McClellan*, 1965-NMSC-094, ¶ 10, 75 N.M. 400, 405 P.2d 405 (holding that the designation of the plaintiff's private property as a game refuge was a taking that

required compensation because the plaintiff was deprived of the right to hunt game on his own property). In *Cedar Point Nursery*, the Supreme Court of the United States considered a regulation that required employers to allow union organizers onto their property for up to three hours per day, 120 days per year. 594 U.S. at 143. The Court held that the regulation infringed on employers' rights to exclude persons from their properties and constituted a physical taking, *id.* at 149-50, and explained "that government-authorized invasions of property—whether by plane, boat, cable, or beachcomber—are physical takings requiring just compensation," *id.* at 152. Thus, an appropriation of property rights is not always about who or what invades private property—including wild animals such as elk—but may instead be about how the private property owner is impacted by the appropriation.

{15}     Along these lines, Plaintiffs argue that Defendants' regulatory management and control of the elk herd has deprived them "of the essential right to control access to their land." We disagree that Defendants have appropriated Plaintiffs' property rights to the extent required to establish a physical taking. *Cf. id.* at 162 (determining that a regulation that "grants a formal entitlement to physically invade the growers' land" constituted a "per se physical taking"); *State ex rel. State Highway Comm'n v. Mauney*, 1966-NMSC-035, ¶¶ 1, 7-9, 18-19, 24, 76 N.M. 36, 411 P.2d 1009 (rejecting a takings claim that was based on diminished traffic passing a landowner's

business and changed the access route to the property, because the road project did not cause total deprivation of access).

{16}     In the present case the regulations do not require elk to be on private property or deny a property owner the right to exclude them—the regulations only limit how a property owner can hunt, harm, or remove them. The Elk Rule regulates how and when certain people can obtain hunting licenses, which the Department generally uses to manage the population of the elk. *See* 19.31.14.14 NMAC (dictating the elk management goals and number of public licenses permitted by region); 19.30.5.8 NMAC (permitting additional hunting licenses for qualified property owners); 19.31.14.13 NMAC (reserving for the Department the authority to authorize population management hunts). EPLUS participation is completely voluntary, and a property owner must enroll, apply, and be accepted in order to obtain the benefits. *See* 19.30.5.8 NMAC. In addition to other requirements, for a landowner to obtain and maintain a landowner hunting license under the EPLUS program (the "elk private lands use system"), they must (1) agree "to accept elk on their property"; (2) "demonstrate" that the private lands have regular elk use and "provide meaningful benefits to elk"; and (3) subject to some exceptions, not benefit or make requests from the Department's depredation assistance program. *See* 19.30.5.8(A), (C)(9) NMAC. Alternatively, to receive depredation assistance, landowners are required to contact the Department when depredation occurs and to use intervention methods

authorized by the Department that are "fiscally responsible, reasonable, effective, and, if practical, long-term solutions to depredation on private lands" with specifically annotated exceptions. *See* 19.30.2.8 NMAC.

{17}   None of these regulations generally require or authorize elk on private properties or prevent property owners from building fences to keep them out. *See* NMSA 1978, § 77-16-1 (1909) (requiring that "[e]very gardener, farmer, planter or other person having lands or crops that would be injured by trespassing animals, shall make a sufficient fence" to prevent the trespass).[3] Though Plaintiffs' right to control access has been impacted by the elk, the regulatory program creates no entitlement for any physical invasion of private property and therefore, does not deprive Plaintiffs of any property right. *See Cedar Point Nursery*, 594 U.S. at 162; *see also SMP Props., LLC*, 2021-NMSC-011, ¶¶ 15-16 (explaining that a court "may decide as a matter of law that there has been no taking or that as a matter of law the

---

[3]Plaintiffs contend that they have built "sufficient" fences to satisfy their obligations under Section 77-16-1, but the elk have destroyed the fences. The parties dispute whether Plaintiffs' fences, built to the specifications of NMSA 1978, § 77-16-4 (1909), are "sufficient" fences for the purpose of Section 77-16-1, but we need not resolve this dispute. Regardless of whether Plaintiffs' fences could be considered "sufficient" to keep out elk, *see Wild Horse Observers Ass'n, Inc. v. N.M. Livestock Bd.*, 2022-NMCA-061, ¶ 19, 519 P.3d 74 ("[I]t is a landowner's duty to build a fence sufficient to prevent wild [animals] from entry onto [their] private property."), the analysis must focus on whether the regulatory program prohibits Plaintiffs from fencing out the elk, which it does not.

evidence does not establish substantial interference" with a property right when no factual questions need to be resolved).

## C. The New Mexico Constitution

{18} As we have set forth, the New Mexico Constitution mandates that "(p)rivate property shall not be taken or damaged for public use without just compensation." N.M. Const. art. II, § 20. To the extent that Plaintiffs argue that they need not show a particular taking simply because their property was "damaged for public use," we disagree. To establish a physical taking in the present case, Plaintiffs had to show that (1) the government caused harm that "affect[s] some right or interest which the landowner enjoys and which is not shared or enjoyed by the public generally," *Pub. Serv. Co. of N.M. v. Catron*, 1982-NMSC-050, ¶ 7, 98 N.M. 134, 646 P.2d 561; (2) the government took at least a calculated risk that harm would result, *Electro-Jet*, 1992-NMSC-060, ¶ 22; and (3) the taking or harm "invade[d] some substantive or intrinsic aspect of a landowner's right to the use and enjoyment of [their] property," *Santa Fe Pac. Tr., Inc. v. City of Albuquerque*, 2014-NMCA-093, ¶ 30, 335 P.3d 232. As we have explained, Defendants' implementation of the regulatory program does not meet these criteria.

{19} For these reasons, we affirm the district court's grant of summary judgment on Plaintiffs' constitutional takings claim.

## II.     The Nuisance Claim

{20}     Defendants separately appeal the district court's denial of summary judgment on Plaintiffs' nuisance claim. Whether alleged as public or private, nuisance claims generally involve unreasonable or negligent nontrespassory invasions of property rights. *See City of Sunland Park v. Harris News, Inc.*, 2005-NMCA-128, ¶ 40, 138 N.M. 588, 124 P.3d 566 (describing a public nuisance as "an unreasonable interference with a right common to the general public" (internal quotation marks and citation omitted)); *id.* ¶ 41 ("In contrast, a private nuisance is distinguished by the interest invaded; it is an unreasonable interference with the private use and enjoyment of land."). NMSA 1978, Section 30-8-1 (1963) describes a public nuisance as "knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority which is either . . . injurious to public health, safety, morals or welfare; or . . . interferes with the exercise and enjoyment of public rights, including the right to use public property." *See also Titus v. City of Albuquerque*, 2011-NMCA-038, ¶ 18, 149 N.M. 556, 252 P.3d 780 (noting that Section 30-8-1 "encompass[es] the common law prohibitions" that bar public nuisances). Liability for a private nuisance, on the other hand, arises from an actor's conduct that "is a legal cause of an invasion of another's interest in the private use and enjoyment of the land, and the invasion is either (a) intentional and unreasonable, or (b) unintentional and otherwise actionable under the rules

controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities." *Scott v. Jordan*, 1983-NMCA-022, ¶ 12, 99 N.M. 567, 661 P.2d 59.

{21} Public and private nuisances can be nuisances per se or nuisances in fact, and Plaintiffs restrict their claims to the latter. "A nuisance in fact is described as an activity or structure which is not a nuisance by nature, but which becomes so because of such factors as surroundings, locality, and the manner in which it is conducted or managed." *City of Sunland Park*, 2005-NMCA-128, ¶ 40 (internal quotation marks and citation omitted). The district court denied summary judgment after determining that "there are questions of fact as to whether elk constitute a nuisance." Plaintiffs maintain that "[t]he factual record establishes, at a minimum, a question of fact as to whether [Defendants have] carried out [their] statutory and regulatory responsibilities in a manner that reasonably protects private property."

{22} Defendants argue that as a matter of law, the conduct cannot have caused a nuisance in fact because (1) "no liability may attach to the State for damage caused by wild" animals such as elk; and (2) "Plaintiffs' nuisance claims [are] mandated by statute and carried out through duly promulgated regulations," which cannot be considered "wrongful or unreasonable conduct." Defendants' arguments raise questions not of fact, but of law—what are the contours of a nuisance claim against a state agency, involving the implementation of policy that attempts to regulate an

unpredictable natural environment. We therefore examine in greater detail the law of nuisance.

{23}     The concept of nuisance is generally defined by the resulting harm, rather than the act that caused the harm. *See Moreno v. Marrs*, 1984-NMCA-077, ¶ 27, 102 N.M. 373, 695 P.2d 1322 (explaining that the law of nuisance "has reference to the interests invaded, to the damage or harm inflicted, and not to any particular kind of act or omission which has led to the invasion" (internal quotation marks and citation omitted), *abrogated on other grounds by Baldonado v. El Paso Nat. Gas Co.*, 2008-NMCA-010, 143 N.M. 297, 176 P.3d 286. This feature distinguishes a nuisance claim from a negligence claim, because "[l]iability for negligence is based on want of care, while liability for nuisance exists regardless of the degree of care exercised to avoid injury." *Wofford v. Rudick*, 1957-NMSC-098, ¶ 9, 63 N.M. 307, 318 P.2d 605; *Padilla v. Lawrence*, 1984-NMCA-064, ¶ 11, 101 N.M. 556, 685 P.2d 964 (same). The harmful act must be one that "falls into the usual categories of tort liability," but that categorization is relevant only to whether the act is "of a kind that subjects [the defendant] to liability." *Moreno*, 1984-NMCA-077, ¶ 28 (internal quotation marks and citation omitted). A "nuisance" therefore exists if the harm is caused, but an actor is generally only accountable if a negligent or intentional act was a cause of that harm. *See id.*; *see also* Restatement (Second) of Torts § 824 (1979) ("The conduct necessary to make the actor liable for either a public or a

private nuisance may consist of (a) an act; or (b) a failure to act under circumstances in which the actor is under a duty to take positive action to prevent or abate the interference with the public interest or the invasion of the private interest.").

{24} Because the common feature of all nuisance is a nontrespassory harm to property interests, nuisance disputes arise among different types of parties—including private landowners, individuals, businesses, and the government. *See, e.g.*, *Espinosa v. Roswell Tower, Inc.*, 1996-NMCA-006, ¶ 3, 121 N.M. 306, 910 P.2d 940 (involving a state agency that claimed a nuisance against a private business for damage caused by violations of asbestos removal regulations); *Town of Clayton v. Mayfield*, 1971-NMSC-061, ¶ 1, 82 N.M. 596, 485 P.2d 352 (involving a city's action against private individuals for injunctive relief for the operation of a junk yard). And nuisance claims have been brought against the government. *See, e.g.*, *Gonzalez v. Whitaker*, 1982-NMCA-050, ¶ 1, 97 N.M. 710, 643 P.2d 274 (involving suit by private parties against an agency to stop the issuance of a permit to a third party, alleging public and private nuisance); *Titus*, 2011-NMCA-038, ¶ 14 (involving a citizen's challenge to the government's designation of particular acts as a nuisance); *State ex rel. Vill. of Los Ranchos de Albuquerque v. City of Albuquerque* (*Los Ranchos III*), 1994-NMSC-126, ¶ 11, 119 N.M. 150, 889 P.2d 185 (involving

an action against a municipality to stop a public works project as a nuisance).[4] We find the analysis in *Los Ranchos III* to be helpful in our current context.

{25}     In *Los Ranchos III*, our Supreme Court considered whether a permitted and approved public works project, that was authorized by law, could be a nuisance. The petitioner, a village government, asserted a claim for public nuisance against the city, based on the anticipated construction of a bridge, and requested "injunctive relief to halt" the project. *Id.* The bridge plans were created by various government groups that had received approvals and permits from multiple state and federal entities, as well as the voters. *Id.* ¶¶ 3-7, 10. Many of the permits, agreements, and approvals had already been unsuccessfully challenged in various courts. *Id.* ¶¶ 6, 8, 10. Although the Court rejected the city's position that the exercise of "municipal discretion is beyond the control of the courts," *id.* ¶ 14 (internal quotation marks omitted), because judicial review "is implicit and inherent in the common law," *id.* ¶ 15, the Court nevertheless acknowledged that judicial review is subject to "scope and timing" limits, *id.* ¶ 16. To that end, the Court explained that to address conflicts between public rights, public needs, and other interests, "the municipality can

---

[4] This Court had twice previously considered this dispute, in *City of Albuquerque v. State ex rel. Los Ranchos de Albuquerque* (*Los Ranchos I*), 1991-NMCA-015, 111 N.M. 608, 808 P.2d 58, and *State ex rel. Los Ranchos de Albuquerque v. City of Albuquerque* (*Los Ranchos II*), 1993-NMCA-147, 119 N.M. 169, 889 P.2d 204, before our Supreme Court took up the issues raised in *Los Ranchos III*.

exercise its discretionary authority to adopt a public policy whose objective is the greatest public good." *Id.* ¶ 18. The city had the discretion to build the bridge and was "most qualified to evaluate engineering problems, traffic patterns, and all the other subtleties involved in such a project." *Id.* ¶ 20. Therefore, when reviewing those types of decisions, the "courts will not interfere with the exercise of municipal powers that are strictly discretionary," provided that "the decisions remain within lawful bounds." *Id.* ¶ 20. The Court explained the limitations of judicial review: "As long as the municipality acts within its sphere of discretion we will not inquire into the wisdom of the act even if it is an economic mistake, a municipal extravagance, and an improper burden upon the taxpayers, as so often urged in contests of this nature." *Id.* ¶ 22 (internal quotation marks and citation omitted).

{26}     The next question was whether the building of the bridge could "be abated as a public nuisance" when the project had been "duly authorized by law." *Id.* ¶ 24. The Court broke this inquiry into two relevant parts: whether the bridge had been duly authorized and whether such authorization then meant that the city had an absolute defense against a nuisance claim. *Id.* ¶¶ 24, 63. The Court first explained that "duly authorized by law" meant receiving all of the required approvals "pertinent to that particular project," *id.*, and that whether a project was "duly authorized by law" was a factual question, *id.* ¶¶ 33-34. The Court next turned to how the principles of nuisance interacted with a duly authorized public works project. *See id.* ¶¶ 50-68.

"A public works project, unlike a private construction project, is a product of the exercise of the legislative power" and carries with it "[t]he presumption . . . that the project is publicly scrutinized and balanced against all interests, public and private, upon which it will have impact." *Id.* ¶ 57. The analysis then turns to whether a "duly authorized"[5] public works project could be determined to be a public nuisance in fact. *Id.* ¶¶ 58, 62.

{27}     The *Los Ranchos III* Court came to two answers. First, "due authorization" is an absolute defense to a claim for public nuisance in fact if the claim is for anticipatory nuisance—the nuisance claim is brought before the public works project has begun. *Id.* ¶ 63. This is because if the bridge was "found to be duly authorized," a presumption would be supported "that the balancing of interests by the [c]ity was thorough and fair." *Id.* ¶ 67. To do otherwise would require the courts to "pretend that our knowledge of bridge building is superior" to the experts that had "debated and collaborated on this project." *Id.* Second, "due authorization" is a qualified defense to a claim for public nuisance in fact if the claim is brought when "the public works project is in existence and poses a present nuisance." *Id.* ¶ 63. In this second

[5]According to Section 30-8-1, "[a] public nuisance consists of knowingly creating, performing or maintaining anything affecting any number of citizens without lawful authority." The *Los Ranchos III* Court explained that "[a]s this statute relates to public works projects," the term "due authorization" was synonymous with the term "lawful authority," which is the converse of an action "without lawful authority." 1994-NMSC-126, ¶ 62.

context, the courts might "decide that despite the defense the project is still a nuisance," *id.*, because the operation or maintenance of the public works project causes harm or damage, *see id.* ¶ 55. For example, even if authorized to be constructed, the construction, maintenance, or operation of a sewage treatment facility or fencing around a public area—or the construction of a bridge—could create a nuisance that resulted in damage. *See id.* (citing *State ex rel. N.M. Water Quality Control Comm'n v. Hobbs*, 1974-NMSC-064, 86 N.M. 444, 525 P.2d 371 (involving a sewage treatment facility) and *Barker v. City of Santa Fe*, 1943-NMSC-012, 47 N.M. 85, 136 P.2d 480 (involving fencing)).

{28}     We see no reason to distinguish a public works project performed by a municipality from a wildlife management project performed by state agencies. Both are authorized by law to conduct the projects. *Compare Los Ranchos III*, 1994-NMSC-126, ¶¶ 24-25 (describing the municipality's authority), *with* NMSA 1978, § 17-1-1 (1921); § 17-1-26 (establishing the Commission's authority to regulate); §§ 17-1-5, -9 (delegating authority from the Commission to the Department), *and* § 17-3-14.1 (providing for the Department's authority to issue landowner elk hunting permits). A municipality uses its discretionary authority to balance the public good with other interests. *Los Ranchos III*, 1994-NMSC-126, ¶¶ 18-20, In the same way, the Legislature declares public policy and establishes the basic standards for carrying out the law, and state agencies, through a limited delegation of

legislative power, determine what acts are necessary to conform to the basic standards established by the Legislature and to enforce legislative policy. *Cf. State ex rel. State Park & Recreation Comm'n v. N.M. State Auth.*, 1966-NMSC-033, ¶ 27, 76 N.M. 1, 411 P.2d 984 (considering the delegation of authority from the Legislature to agencies); *City of Albuquerque v. N.M. Pub. Regul. Comm'n*, 2003-NMSC-028, ¶ 16, 134 N.M. 472, 79 P.3d 297 ("[A]n act of an administrative agency which is authorized by the Legislature has the force and effect of law." (alteration, internal quotation marks and citation omitted)). Like a municipality's permitting decision, the exercise of agency discretion includes fact-finding determinations and enforcement decisions, which are subject to a highly deferential judicial review. *See Duke City Lumber Co. v. N.M. Env't Improvement Bd.*, 1984-NMSC-042, ¶¶ 7-14, 101 N.M. 291, 681 P.2d 717 (establishing the standard of review for agency decisions); *cf. State ex rel. Norvell v. Arizona Pub. Serv. Co.*, 1973-NMSC-051, ¶ 35, 85 N.M. 165, 510 P.2d 98 (considering the primary jurisdiction doctrine and noting that a court "should exercise its discretion with an understanding that the [L]egislature has created the agency in order to afford a systematic method of fact[-]finding and policymaking and that the agency's jurisdiction should be given priority in the absence of a valid reason for judicial intervention" (internal quotation marks and citation omitted)). In this way, the relationship between the Legislature's policy-making and Defendants' fact-finding mirrors the authority of a municipality "to

adopt a public policy whose objective is the greatest public good" in circumstances "[w]hen public rights and needs come in conflict with other interests." *See Los Ranchos III*, 1994-NMSC-126, ¶ 18. We therefore apply the *Los Ranchos III* governing principles to Plaintiffs' nuisance claim.[6] But to do this, we must detour to define the parameters of that claim.

{29}    Plaintiffs argue that "the nuisance is the State's ongoing management of the elk herds and refusal to mitigate the foreseeable consequences of those policies that have resulted in an unreasonable invasion of Landowner[s'] private use and enjoyment of the land." At one end of this nuisance spectrum, Plaintiffs disclaim any notion that the elk themselves are the nuisance, and at the other end, they also deny that the nuisance is the regulations or policies that support them. Instead, Plaintiffs focus on Defendants' implementation of the regulatory program by way of

---

[6]*Los Ranchos III*, 1994-NMSC-126, ¶ 62, involved a public nuisance, and in the present case, Plaintiffs assert both public and private nuisance claims. In the present context, the distinction between the harms has no impact on our analysis. The distinction between a public and private nuisance lies primarily in the right impacted. A public nuisance is "described as an unreasonable interference with a right common to the general public" and a private nuisance "is an unreasonable interference with the private use and enjoyment of land." *See City of Sunland Park*, 2005-NMCA-128, ¶¶ 40-41 (distinguishing between a private and public nuisance based on the kind of interest invaded and number of people impacted). Plaintiffs' nuisance claims do not turn on distinctions between differing interests, and so we do not separately address public and private nuisance. But we caution that the distinction may play a role in some cases.

discretionary decisions—decisions "below policy level" that are not dictated by law but that are within Defendants' discretion to enforce legislative policy.

{30}     Those discretionary decisions, as has been noted, stem from multiple statutes and regulations. Defendants have the authority to regulate wildlife, issue licenses for landowner permits to hunt elk, to authorize population management hunts, and to manage the depredation program. *See* § 17-1-26 (providing for the Commission's authority to make rules and regulations and establish services that it "deem[s] necessary to carry out all the provisions and purposes of this act, and all other acts relating to game and fish"); § 17-3-14.1 (providing landowner permits); 19.31.14.13 NMAC (allowing for the authorization of population management hunts); 19.31.14.6 NMAC (providing for public licenses); 19.30.5.8 NMAC (providing EPLUS licenses); 19.30.2.8 NMAC (providing procedures for the depredation program). The Department, with "the verbal concurrence of the" Commission chairperson or a designee, "may adjust the number of licenses or authorizations up or down by no more than twenty percent to address significant changes in population levels or to address critical department management needs," and authorizations or licenses in a particular area "may be adjusted beyond this amount as necessary to meet management objectives." *See* 19.31.14.8 NMAC. Plaintiffs do not assert that Defendants have acted contrary to these regulations and policies. Instead, Plaintiffs argue that Defendants' refusal to use these discretionary tools to reduce the elk

population constitutes a nuisance in fact, and they seek abatement of that nuisance in the form of injunctive relief.[7] Defendants response is two-fold: (1) Defendants' conduct is duly authorized by law because Plaintiffs' core argument arises from policy-based decisions regarding the elk population, and (2) regardless, a claim for nuisance cannot be established based on harm caused by wildlife. We agree, to an extent, with Defendants.

{31}     Plaintiffs' claimed nuisance resembles the anticipatory nuisance described in *Los Ranchos III*. As discussed, although due authorization to perform a project is an absolute defense to a claim that a permitted (or authorized) project will be a nuisance

---

[7] A civil nuisance claim is a tort. *See Padilla*, 1984-NMCA-064, ¶ 9 ("[Nuisance] is a civil wrong based on a disturbance of rights in land."); Restatement (Second) of Torts § 821A (1979) (defining types of nuisances); *cf. Moreno*, 1984-NMCA-077, ¶ 27 ("Nuisances are types of damage—the invasion of [public and private interests], by conduct which is tortious because it falls into the usual categories of tort liability."). Under the Tort Claims Act, the state is immune for any tort seeking monetary damages unless immunity is waived. *See* NMSA 1978, § 41-4-4 (2001) ("A governmental entity and any public employee while acting within the scope of duty are granted immunity from liability for any tort except" where waived by statute). In response to Defendants' earlier-filed motion to dismiss, Plaintiffs argued in the district court that parties may recover injunctive relief against the state as set forth in NMSA 1978, § 41-4-17(A) (1982). The district court denied the motion to dismiss, and the question of immunity is not before us in this interlocutory appeal relating to the later summary judgment motions, nor have the parties addressed the appropriateness of injunctive relief under these circumstances. *See Insure N.M., LLC v. McGonigle*, 2000-NMCA-018, ¶ 6, 128 N.M. 611, 995 P.2d 1053 (identifying the factors to be balanced when determining whether to grant injunctive relief); *see also Fernandez v. Farmers Ins. Co. of Ariz.*, 1993-NMSC-035, ¶ 15, 115 N.M. 622, 857 P.2d 22 ("The general rule is that cases are not authority for propositions not considered." (internal quotation marks and citation omitted)).

in the future, due authorization is only a qualified defense for a present nuisance. *Id.* ¶ 63. In the bridge context, after the permits are issued, a nuisance claim could arise later from ongoing acts that were necessary to construct or maintain the bridge. *Id.* While the permit approvals of the bridge can be separated from the construction or maintenance, nothing in this case sets the regulatory program itself apart from the discretionary decisions necessary to implement that regulatory program. Plaintiffs' assertion that the nuisance is the intentional or negligent implementation of the discretionary aspects of the regulatory program is akin to saying that the *permit* in *Los Ranchos III* is the nuisance. There, before it was built the permitted bridge could only be measured "by its compliance with the approval process itself." *Id.* ¶ 67. So too, the implementation of the regulatory program can only be measured by compliance with the regulations, authorizing statutes, and policies. For this reason, the ongoing implementation of the regulatory program is akin to ongoing permit approvals for the bridge—as if each step of building and maintenance of the bridge were permitted and approved as it happened. The distinction made by the *Los Ranchos III* Court between anticipatory and present nuisance has no role to play here. Defendants were duly authorized to make discretionary implementation decisions and no other separate act or omission of Defendants' caused harm. As a result, the absolute defense established in *Los Ranchos III* applies to Defendants' acts and omissions in implementing the regulatory program.

{32}      Plaintiffs nevertheless attempt to impute the damage caused by the elk to Defendants and note that in other circumstances, nuisance claims have been established even though the harm was caused by wildlife, referring primarily to cases in which cattle operations have been established to be nuisances based, in part, on harm caused by insects that were attracted by the cattle operation. *See, e.g.*, *Padilla*, 1984-NMCA-064, ¶¶ 4, 6; *Scott*, 1983-NMCA-022, ¶ 26. In these cases, however, the nuisance claims were brought against private actors who ran cattle operations and not government agencies responsible for overseeing cattle operations. *See Padilla*, 1984-NMCA-064, ¶ 1; *Scott*, 1983-NMCA-022, ¶¶ 4-6; *Moreno*, 1984-NMCA-077, ¶¶ 28-29 (explaining that accountability for a nuisance requires harm "by conduct" that is "of a kind that subjects [the defendant] to liability" (internal quotation marks and citation omitted)). While these cases do not discuss permitting, analogy to *Los Ranchos III* is perhaps helpful. *See* 1994-NMSC-126. The cattle operators' acts were duly authorized by law to the extent that they were allowed to operate by the government, but after receiving permission, the permit afforded only a qualified defense for their ongoing operations and any future nuisance. *Id.* ¶ 63. In the present case, the challenged act or failure to act is Defendants' discretionary implementation of the regulatory program. No other act—like building the bridge or running a cattle operation—followed Defendants' acts that were duly authorized by law. Instead, as Plaintiffs argue, "the elk are the instrument" that caused the harm.

The harm caused by the elk "is not of a kind that subjects [Defendants] to liability" for nuisance. *See Moreno*, 1984-NMCA-077, ¶ 28 (internal quotation marks and citation omitted); *see also* Restatement (Second) of Torts § 824 (1979) (requiring an act or omission "to make the actor liable" for nuisance).

{33}     The parties in the present case dispute the proper size of the elk population in Catron County. Plaintiffs want the courts to compel Defendants to use regulatory tools so that there are fewer elk. But Defendants have engaged in legislatively-approved policy-making and fact-finding to manage the elk population. *Cf. Gonzalez*, 1982-NMCA-050, ¶ 8 (noting in the context of a primary jurisdiction analysis that the balance between the courts and administrative agencies "depends on whether the questions presented are exclusively factual issues within the peculiar expertise of the commission or if statutory interpretation or issues of law are significant" (internal quotation marks and citation omitted)). The relief sought by Plaintiffs—the authorization of population management hunts—involves conditions and terms that would cast the judiciary as a semi-permanent and ill-suited administrator in the implementation of the regulatory program. *See Los Ranchos III*, 1994-NMSC-126, ¶ 22 (cautioning against placing "courts in the untenable role of administration rather than adjudication").

{34}     The opportunity to challenge the rules and regulations of the Commission "concerning hunting or fishing" is made available by statute. NMSA 1978, § 17-1-

27 (1921) (explaining that a petition challenging any "rule or regulation promulgated by the commission" requires the commission to "grant a public hearing" and "give full opportunity for all persons to be heard on the point in controversy"); *see also* 19.30.17.10 NMAC (describing the opportunity for written comment about proposed rules); 19.30.17.11 NMAC (describing the procedural rules for public hearings regarding rule making); 19.31.14.4 NMAC (providing notice that the Elk Rule will expire in 2027); Rule 1-075 NMRA (describing the appeal process for certain agency decisions). And, to the extent that the law allows for discretionary action or inaction that harms the public—it is for the Legislature to address a policy imbalance and narrow or delineate the scope of an agency's authority. *See State ex rel. Taylor v. Johnson*, 1998-NMSC-015, ¶ 22, 125 N.M. 343, 961 P.2d 768 ("Generally, the Legislature, not the administrative agency, declares the policy and establishes primary standards to which the agency must conform" and "[t]he administrative agency's discretion may not justify altering, modifying or extending the reach of a law created by the Legislature."); *id.* ¶ 41 (explaining that the Legislature "sets boundaries for the agency's exercise of the authority granted by the Legislature"). Thus, relief for the harm alleged by Plaintiffs is not foreclosed but must be made by an appropriate challenge to the Commission's rules and regulations or by obtaining a change in policy effectuated by the Legislature.

{35} For these reasons, we conclude that Defendants were entitled to summary judgment on Plaintiffs' claim for nuisance. The district court's denial of summary judgment on this claim is therefore reversed.

**CONCLUSION**

{36} We affirm in part and reverse in part, and we remand for proceedings consistent with this opinion.

{37} **IT IS SO ORDERED.**


_____
**KATHERINE A. WRAY, Judge**

**WE CONCUR:**


_____
**JENNIFER L. ATTREP, Judge**


_____
**GERALD E. BACA, Judge**